UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| DORMAN ANGEL, et al., | :: | CASE NO. C-1-01 467 |
| Plaintiffs | :: | JUDGE:  BECKWITH |
| | | MAGISTRATE JUDGE: BLACK |
| vs. | :: | |
| UNITED PAPERWORKERS INTERNATIONAL UNION (PACE) LOCAL 1967, et al. | :: | |
| | :: | |
| Defendants | | |

: : : :: : : :

## DECLARATION OF KEN STANIFER

STATE OF OHIO　　　　　　　)
　　　　　　　　　　　　　　　:SS
COUNTY OF HAMILTON　　　)

1.　　My name is Ken Stanifer. I am a representative and agent of PACE. I have been employed by PACE and its predecessor union as a representative since 1986. Prior to that, I was president of the Champion local for the period 1977 to 1981, and 1982 to 1986. Before that, I held various positions in the Champion local from the time in 1968 that I was first employed at Champion. I am 66 years old.

2.　　When I began at Champion, it had approximately 2,100 hourly employees in Hamilton, including me. Over the years, the local membership declined to about 600 in 2001. In the intervening

-1-

period, most the job reductions were by layoffs from which people were never recalled, and from attrition.

3.    In 1996-1997, Champion did a mill reconfiguration under which the number of jobs was reduced, and under which people who were eliminated got fixed amounts of severance pay if they were eliminated because of the reconfiguration. This was in accordance with an agreement between the union and the company at the time. Since that time, no employees have been eligible for any benefits under the reconfiguration agreement.

4.    Champion sold out, in its entirety, to International Paper in 2000, and International Paper became the employer under the contract. In late 2000, International Paper made an agreement to sell the Hamilton mill to an investor group representing Smart Paper. In January, 2001, International Paper entered into negotiations with the unions to bargain about the effects of the sale of the mill. The shutdown date was in February of 2001.

5.    Our contract with International Paper included a no-strike clause, and we had virtually no leverage. Our aim was to resolve all pending grievances with International Paper, and to get some compensation for the people who would be most severely affected by the shutdown. Article XVI of our Constitution provides, in Article XVI § (3), for the union's resolution of grievances, and in Article XVI § (1), for the adoption of any collective bargaining agreement despite a membership vote in cases where the union is not in a position to conduct an effective strike. A copy of that provision is attached as Exhibit A.

6.    When we got to the end of negotiations, Jerry Johnston, our International Vice President, told me that although we could have a vote the International should sign the agreement

-2-

regardless of the outcome of the vote; it was his opinion, and was and is my opinion, that this was necessary to get resolution of grievances and to get some benefits for the people who would be jobless.

7.    Approximately 400 people got jobs at the mill with Smart Paper. Of these 400, approximately seventy-five are parties to this lawsuit, contending that they should have got severance pay,.

8.    I have conducted effects-bargaining on shutdown with at least four plants in the past – Certainteed, Weyerhauser, International Paper (Springdale), and Dyna-Con. At all of these we reached final agreement on an effects-bargaining package without a membership vote. In all of these situations, like the Hamilton situation, we did not have any leverage from any strike threat and the alternative would have been no benefits for anyone.

KEN STANIFER

Sworn to before me and subscribed in my presence this 1st day of March, 2005.

NOTARY PUBLIC

BARBARA J. KRUMMEN
Notary Public - State of Ohio
My Commission Expires: 11/6/2005

-3-

Section 7. Regional Councils shall operate primarily for the purpose of exchanging information and establishing voluntary programs among the Locals within the Region. Regional Councils shall have no legislation or administrative authority that is contrary to the other provisions of this Constitution.

Section 8. All Local Unions will be urged to affiliate and actively participate in the activities of Regional Councils.

### ARTICLE XVI
### COLLECTIVE BARGAINING AGREEMENTS

Section 1. A collective bargaining agreement must be ratified and approved by a majority of the members covered by said agreement present and voting on the question by secret ballot before the same shall be executed on behalf of the Union; except in the case of multi-plant or multi-employer agreements, where the Local Union has authorized designated delegates to ratify a collective bargaining agreement, in which case the agreement shall be executed upon the ratification of the agreement by a majority of the delegates of all represented Local Unions present and voting by secret ballot.

For former UPIU Local Unions, should a vote for ratification of a contract fail to yield a majority vote as required for acceptance by this Constitution, and then fail to yield the two-thirds (2/3) majority vote necessary for strike sanction, the Local or multiple so affected shall be considered to have accepted the labor agreement.

Section 2. The application and termination of collective bargaining agreements of the merged Union shall be administered according to the past practice of the respective Unions and/or pursuant to individual contract provisions; however, negotiations for collective bargaining agreements shall be subject to supervision by, and their terms and conditions subject to the approval of, the International President.

Section 3. The International Union or Local Union, as the case may be, acting as the exclusive collective bargaining representative of the members, is irrevocably authorized and empowered by each member to present, negotiate and settle any and all grievances, complaints and disputes arising out of the relationship between the member and his or her employer. The provisions of this Constitution relating to the exhaustion of internal

Union remedies shall be fully applicable to matters covered by this Section.

Section 4. Three (3) copies of any agreement or supplement negotiated and placed into effect must be forwarded to the International Office within sixty (60) days after execution of same. Forwarding of these copies shall be the responsibility of the Local Union, other subordinate body, or International Representative, who has conducted such negotiations. The International Union shall keep such contracts on file so long as they are useful, and such contracts, agreements or supplements shall be the property of the International Union.

### ARTICLE XVII
### COORDINATED BARGAINING PROCEDURES

Rules and regulations to cover coordinated bargaining procedures involving other Unions may be promulgated and instituted with the approval of the International Executive Board.

### ARTICLE XVIII
### NATIONAL BARGAINING POLICY

Section 1. An Oil, Chemical & Atomic Industry National Bargaining Policy Committee of the International shall consist of the International President, the Executive Vice President, and/or Vice President(s)-at-Large whose assignment covers the responsibility for the industry, and one rank-and-file Policy Committee Member from each affected region. The rank-and-file Policy Committee Member shall be selected by the Regional Council in such manner as the Regional Council may determine and shall serve for a period of one (1) year, or until any pending program has been completed.

The Executive Vice President shall be Chairman of the National Bargaining Policy Committee. The Chairman shall be entitled to vote on all questions before the Committee. Site of the meetings shall be determined by the International President.

Section 2. Where there is sufficient common interest in formulating industry bargaining policy, or upon the request of fifty percent (50%) of the National Bargaining Policy Committee, the International President or his designee shall convene the National Bargaining Policy Committee.