**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| Elmer Campbell, <u>et al.</u>, | ) |
| | ) |
| | ) |
| Plaintiffs, | ) Case No. 1:01-CV-527 |
| | ) |
| vs. | ) |
| | ) |
| International Paper | ) |
| Company, <u>et al.</u>, | ) |
| | ) |
| Defendants. | ) |

O R D E R

This matter is before the Court on motions for summary judgment filed by Defendants Sun Capital Partners, Inc. (Doc. No. 103) and Smart Papers, LLC (Doc. No. 105). For the reasons set forth below, both motions are well-taken and are **GRANTED**.

I. <u>Background</u>

A. <u>Procedural History</u>

This lawsuit arises out of International Paper Company's sale of the B Street Mill in Hamilton to Defendant Smart Papers LLC in February 2001. Plaintiffs in this case are 72 former hourly employees of International Paper Company. Sixty-four of the Plaintiffs did not receive offers of employment from Smart Papers when Smart Papers began operating the mill. Eight of the Plaintiffs received offers of employment from Smart Papers but claim that Smart Papers gave the jobs they wanted to substantially younger persons.

Plaintiffs filed suit against International Paper Company, Smart Papers LLC, and Sun Capital Partners, Inc., Smart Papers' parent corporation, asserting the following causes of action:

Count I asserts claims under the Age Discrimination in Employment Act ("the ADEA"), 29 U.S.C. § 621, et seq., on behalf of sixty-six of the Plaintiffs. This Count alleges that Defendants violated the ADEA by not hiring them because of their age.

Count II also asserts claims under the ADEA on behalf of six of the Plaintiffs. This Count is captioned as a constructive discharge/demotion claim, but, as interpreted by the Court, Plaintiffs allege that while they were offered jobs with Smart Papers, they were offered lesser positions than those they held with International Paper and that substantially younger persons got the jobs they were seeking.

Count III asserts age discrimination claims under the Ohio Civil Rights Act, Ohio Rev. Code Chapter 4112, on behalf of the sixty-six Plaintiffs mentioned in Count I.

Count IV asserts the constructive discharge/demotion claim of Count II under the Ohio Civil Rights Act.

Count V alleges that Smart Paper and Sun Capital violated ERISA, 29 U.S.C. § 1140, by not hiring Plaintiffs in

2

order to prevent them from becoming participants in various employee benefits plans.

Count VI alleges that International Paper violated the Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. § 2102(a), by not giving Plaintiffs 60 days notice of the closing of the Mill.

Counts VII and VIII assert disability discrimination claims under the Americans With Disabilities Act ("the ADA"), 42 U.S.C. 12101, et seq., and the Ohio Civil Rights Act, respectively, on behalf of twelve of the Plaintiffs.  These Counts allege that Plaintiffs were discriminated against because of their disabilities and treated differently from non-disabled employees.

Count IX asserts a state law defamation claim.  This Count alleges that International Paper made disparaging remarks about Plaintiffs to Smart Paper and Sun Capital, such as they were "excess baggage."  Plaintiffs apparently believe that these remarks played a part in Smart Papers' decision not to hire them to work in the Mill.

Finally, Count X alleges that Defendants violated Ohio public policy by discriminating against them on the basis of age and disability.

On motions to dismiss filed by the Defendants, the Court dismissed the ERISA claims in Count V and the public policy

3

violation claims in Count X. See Doc. No. 64. The case then proceeded through discovery on the remaining claims. In September 2003, Defendants filed motions for summary judgment on the remaining claims. In response to the motions for summary judgment, Plaintiffs conceded that there was no evidence that Smart Papers defamed them or discriminated against them on the basis of disability. See Doc. No. 114, at 1. Counsel for Plaintiffs further conceded that summary judgment in favor of Smart Papers and against six Plaintiffs who failed to appear at their scheduled depositions is appropriate. Plaintiffs also conceded that there is no evidence that International Paper discriminated against them on the basis of age or disability. See Doc. No. 113, at 2 n.2. Certain of the Plaintiffs also conceded that there was no evidence that International Paper had defamed them. Id. at 2 n.1.

Plaintiffs later reached a settlement agreement with International Paper Company on their WARN Act and defamation claims and recently moved to voluntarily dismiss those claims with prejudice. See Doc. No. 132. Thus, the only claims remaining in this case are Plaintiffs' age discrimination claims versus Smart Papers and Sun Capital.[1]

---

[1]    Because Plaintiffs concede there is no evidence of defamation by Smart Papers and Sun Capital, Defendants' motions for summary judgment on the defamation claims are well-taken and are **GRANTED**. Similarly, because Plaintiffs conceded there is no evidence that Smart Papers and Sun Capital discriminated against

4

B. <u>Factual Background</u>

1. <u>The B Street Mill</u>

Champion International Corporation ("Champion") built the B Street Mill in 1894 and operated it continuously until 2000. Champion used the Mill to manufacture premium cast-coated and uncoated papers. Once profitable, economic downturns within the paper industry made operating the Mill a losing proposition. In June 2000, International Paper Company acquired all the assets of Champion, including the B Street Mill. Although International Paper is and was the largest paper company in the United States, the Mill continued to sustain operating losses of over $1 million per month. The Mill's prospects were apparently so dismal that after only seven months of ownership and operation, International Paper reached an agreement to sell the Mill to Smart Papers LLC. <u>See</u> Doc. No. 105, Ex. 1, Maheu Aff. ¶¶ 4-7.

2. <u>Smart Papers LLC and Sun Capital Partners, Inc.</u>

Sun Capital Partners, Inc. ("Sun Capital") is a Florida investment firm. Sun Capital is affiliated with companies who in turn make their own investments and acquisitions. One of Sun

---

certain of the Plaintiffs on the basis of disability, Defendants' motions for summary judgment on Plaintiffs' disability discrimination claims are well-taken and are **GRANTED**. Finally, counsel for Plaintiffs concedes that summary judgment against Plaintiffs Fisher, Gumm, Jackson, Parsley, Ratliff, and Whitaker is appropriate for failure to appear at their scheduled depositions. Accordingly, Defendants' motions for summary judgment as to the claims of these Plaintiffs are well-taken and are **GRANTED**. All of these claims are **DISMISSED WITH PREJUDICE.**

Capital's affiliates is Sun Premium Paper Partners ("Sun

Premium"). Sun Premium owns Smart Papers LLC. Smart Papers LLC

was formed solely for the purpose of acquiring and operating the

B Street Mill. See id. Ex. 3, Couch Aff. ¶¶ 5-8.

### 3. The Sale of the Mill to Smart Papers

Daniel Maheu came to the Mill in 1992 charged with the

task of turning it into a profitable business. Despite

implementing a number of changes in the Mill's operations and

structure, it continued to underperform expectations. At about

the time International Paper and Smart Papers reached an

agreement in principle to sell the Mill, Smart Papers approached

Maheu about becoming a paid consultant for Smart Papers. After

signing on with Smart Papers, Maheu's primary task was hiring an

initial workforce and establishing the terms and conditions of

employment. Maheu Aff. ¶¶ 6-8.

International Paper had been operating the Mill with a

workforce of about 800 employees. Maheu believed, however, that

the Mill could be operated successfully with as few as 600

employees. In addition, Maheu determined that in order to run

the Mill profitably, wages would have to be cut by as much as

20%. Under the terms of the sale agreement, all International

Paper employees would be terminated on the closing date, which

was February 9, 2001. The former International Paper employees

were then required to apply for employment with Smart Papers in

6

order to stay on at the Mill.  Maheu's goal was to hire 350 to 450 hourly employees and approximately 150 salaried employees. Id. ¶¶ 9-10, 13.

### 4. The Interview Process

In January 2001, Smart Papers retained The Weissman Group to serve as its acting human resources department and to develop a plan for interviewing, evaluating, and hiring the initial workforce.  Doc. No. 105, Ex. 2, Weissman Aff. ¶ 3. Under the plan that was developed for the hiring of hourly employees, Smart Papers conducted interviews with former managers and supervisors of International Paper and obtained their evaluations of each applicant.

These managers and supervisors also completed a form entitled "Applicant Reference Check" in which they graded each applicant in the categories of willingness and ability to learn, excellence oriented, productivity, dependability, team player, and safety awareness.  The form then asked the respondent to recommend whether the candidate should be hired.  In some cases, the respondent assigned a color code, either green, yellow, or red, to the recommendation.  Green was a positive recommendation, red was a negative recommendation, and yellow indicated the candidate was possibly acceptable.  Weissman Group employees then conducted a marathon series of short interviews with each applicant and graded each applicant in the same six categories.

7

Finally, the interviewer assigned the applicant the same green, red, or yellow color code. Accordingly to Weissman, in determining the final recommendation to give to an applicant, the reference forms submitted by International Paper carried more weight than the interview scores. Weissman Dep. at 165-66. The interview score was not an automatic disqualifier, but a poor reference from International Paper could result in disqualification. Id. at 166.

Applicants were not applying for particular positions. Rather, once the initial workforce was hired, Smart Papers placed the applicants into their particular positions. Maheu testified that he hired only those applicants to whom The Weissman Group gave a favorable recommendation. Maheu Dep. at 40. Maheu extended job offers to all applicants whom The Weissman Group rated green or yellow. Id. at 53. Applicants who received a red recommendation were not eligible for employment. Id. at 53-56.

Applicants were also required to take and pass a drug test to be considered for employment. Failing the drug test meant automatic disqualification for employment. Weissman Dep. at 133-34. Smart Papers used hair sample testing to screen for drugs. Fifty-six of the applicants, including eighteen of the Plaintiffs in this case, tested positive for marijuana or cocaine and were rejected for employment. Maheu Aff. ¶ 12.

8

There were 568 applicants for hourly positions at the Mill, of whom Maheu hired 410. Of the 568 applicants, 522 (91.9%) were age 40 or over. Of the 410 applicants Maheu actually hired, 379 (92.4%) were age 40 or over. Maheu Aff. ¶ 11.

### 5. The Plaintiffs

As stated earlier, Plaintiffs in this case claim that Smart Papers rejected them for employment at the Mill or otherwise discriminated against them on the basis of age. Most of the Plaintiffs claim that Smart Papers discriminated against them on the basis of age by not hiring them. Eight of the Plaintiffs, in claims they persist in calling constructive discharge claims even though Smart Papers offered them jobs, allege that Smart Papers discriminated against them on the basis of age by giving more desirable positions to substantially younger persons.

As indicated above, eighteen of the Plaintiffs[2] failed drug tests and were not offered positions. Of these Plaintiffs, thirteen of them would have received positive recommendations for hire but for failing the drug test. See Doc. No. 105, Individual Plaintiffs' Appendix. Each of the remaining forty-six Plaintiffs

---

[2]    Blevins, Clear, Gentry, Gill, Gregory, Jackson, Johnson, Lakes, Marsee, Miller, Pennington, Ratliff, Rodgers, Spada, Tolbert, Turley, Whitaker, and Wilkins.

who did not receive offers of employment from Smart Papers
received overall ratings of "red" from The Weissman Group.  Id.

### 6. The Present Motions

Smart Papers and Sun Capital each move for summary
judgment on Plaintiffs' remaining claims of age discrimination.
Sun Capital's liability, if it exists at all, is derivative of
Smart Papers' liability for age discrimination.  Therefore, the
Court's analysis shall initially concentrate on Smart Papers'
motion.

Smart Papers contends that summary judgment in its
favor is appropriate as to the Plaintiffs who did not receive job
offers because the record shows that they were rejected for
employment either because they received negative recommendations
from The Weissman Group or because they failed their drug tests.
Smart Papers argues that summary judgment in its favor is
appropriate as to the remaining eight Plaintiffs because they
either received higher paying jobs than the jobs they actually
wanted, wanted severance pay from International Paper instead of
a job from Smart Papers,[3] or were actually promoted to higher
paying positions soon after being hired.  Smart Papers also

---

[3]    Under the terms of a severance payment program offered
by International Paper, which is not at issue here but was the
subject of other litigation before the Court, former employees
who did not receive job offers from Smart Papers were eligible
for severance benefits.  Former employees who did receive job
offers from Smart Papers were not eligible for severance
benefits.

argues that the record shows that it also hired applicants as old or older than Plaintiffs for the positions they wanted, thus demonstrating that age was not a determining factor in its placement decisions.

In opposition, Plaintiffs argue that Smart Papers' reasons for not hiring them are but pretexts for age discrimination because the reasons were insufficient to motivate Smart Papers' hiring decisions. Plaintiffs claim they were unfairly stereotyped as being inflexible and unwilling to learn. Plaintiffs further argue that failing the drug test was an insufficient reason not to hire them because Smart Papers later hired many applicants with prior criminal histories, including applicants with substance abuse offenses. Plaintiffs also contend that hair sample testing is an unreliable method to detect drug use. Plaintiffs contend that pretext is shown because Smart Papers disregarded their years of experience at the Mill and later hired many younger off-the-street applicants with little or no experience in the paper industry. Plaintiffs further allege that pretext is shown because Smart Papers surreptitiously collected age data on all of its applicants. Finally, Plaintiffs also argue that age discrimination is demonstrated because the average age of the workforce dropped dramatically in the year following Smart Papers' purchase of the Mill.

11

The motions for summary judgment are now fully briefed and ready for disposition.

## II. Summary Judgment Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The evidence presented on a motion for summary judgment is construed in the light most favorable to the non-moving party, who is given the benefit of all favorable inferences that can be drawn therefrom. United States v. Diebold, Inc., 369 U.S. 654 (1962). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)(emphasis in original). The Court will not grant summary judgment unless it is clear that a trial is unnecessary. The threshold inquiry to determine whether there is a need for trial is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250. There is no issue for trial

12

unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  Id.

The fact that the weight of the evidence favors the moving party does not authorize a court to grant summary judgment.  Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 472 (1962).  "[T]he issue of material fact required by Rule 56(c) . . . to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or a judge to resolve the parties' differing versions of the truth at trial."  First National Bank v. Cities Service Co., 391 U.S. 253, 288-89 (1968).

Moreover, although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, Smith v. Hudson, 600 F.2d 60, 63 (6th Cir.), cert. dismissed, 444 U.S. 986 (1979), the United States Supreme Court has stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).  According to the Supreme Court, the standard for granting summary judgment mirrors the standard for a

13

directed verdict, and thus summary judgment is appropriate if the moving party establishes that there is insufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Id. at 323; Anderson, 477 U.S. at 250.

Accordingly, summary judgment is clearly proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322. Significantly, the Supreme Court also instructs that the "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion" against a party who fails to make that showing with significantly probative evidence. Id.; Anderson, 477 U.S. at 250. Rule 56(e) requires the non-moving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Id.

Further, there is no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or similar materials negating the opponent's claim. Id. Rule 56(a) and (b) provide that parties may move for summary judgment "with or without supporting affidavits." Accordingly, where the non-moving party will bear the burden of proof at trial on a dispositive issue, summary judgment may be appropriate based

14

solely on the pleadings, depositions, answers to interrogatories,
and admissions on file.

### III. Analysis

Before starting the analysis, the Court observes that
claims of age discrimination under the Ohio Civil Rights Act are
subject to the same evidentiary standards as claims arising under
the ADEA.  Therefore, the Court may analyze Plaintiffs' federal
and state statutory claim concurrently.  Fisher v. Lincoln
Electric Co., 285 F.3d 456, 469 (6th Cir. 2002).

A plaintiff may establish a prima facie case of age
discrimination either through direct evidence or circumstantial
evidence.  Manzer v. Diamond Shamrock Chem. Co., 29 F.3d 1078,
1081 (6th Cir. 1994).  If the plaintiff presents direct evidence
that the employer discriminated against him or her on the basis
of age, the burden of production shifts to the employer who then
must show that it would have taken the same action even without
the discriminatory motivation.  Id.

In the absence of direct evidence of discrimination,
the plaintiff may establish a prima facie case of discrimination
through the familiar McDonnell Douglas burden shifting framework.
Id.  Under this method, the plaintiff establishes a prima facie
case of discrimination by showing: 1) he or she is a member of a
protected class; 2) he or she suffered an adverse employment
action; 3) he or she was qualified for the job lost or not
gained; and 4) that a person substantially younger than the

15

plaintiff replaced or was selected over him or her, or that the position remained open while the employer sought other applicants. O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 313 (1996); Monette v. Electronic Data Sys. Corp., 90 F.3d 1173, 1186 n.12 (6th Cir. 1996); Cooley v. Carmike Cinemas, Inc., 25 F.3d 1325, 1329 (6th Cir. 1994). A plaintiff may also satisfy the last part of the McDonnell Douglas test by showing that the defendant treated similarly situated non-protected persons more favorably than the plaintiff. Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1246 (6th Cir. 1995). Once the plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the defendant to proffer legitimate non-discriminatory reasons for its actions. Manzer, 29 F.3d at 1082.

If the defendant meets its burden of production, the burden shifts back to the plaintiff to show that the reasons proffered by the defendant are pretextual. Id. However, the burden of persuasion remains with the plaintiff at all times. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993).

The plaintiff may prove pretext in three ways: 1) by showing that the defendant's reasons had no basis in fact; 2) by showing that the reasons did not actually motivate the defendant; or, 3) by showing that the proffered reasons were not sufficient to warrant the action taken. Kline v. Tennessee Valley

16

Authority, 128 F.3d 337, 346 (6th Cir. 1997).  When the plaintiff

proves pretext by the first or third methods, the fact finder may

infer discrimination and the plaintiff need not produce any

additional evidence of discrimination.  Id.  In the second

situation, the factual basis for the discharge is not challenged;

therefore, the plaintiff must adduce additional evidence of

discrimination in order to prevail.  Id. at 346-47.

In this case, there is no direct evidence, such as

disparaging or derogatory comments by persons involved in the

hiring process, that Smart Papers discriminated against

Plaintiffs on the basis of age.  Therefore, the case proceeds

through the McDonnell Douglas circumstantial evidence analysis.

For purposes of the present motions, the Court will

assume that each Plaintiff can establish a prima facie case that

Smart Papers discriminated against him or her on the basis of

age.  For those Plaintiffs to whom Smart Papers did not extend

job offers, Smart Papers has proffered a legitimate non-

discriminatory reason for not hiring that Plaintiff.  Rejecting

an applicant for failing a drug test is a legitimate, non-

discriminatory employment action.  Shiplett v. National R.R.

Passenger Corp., No. 97-2056, 1999 WL 435169, at **10 n. 2 (6th

Cir. June 17, 1999).  Likewise, rejecting the Plaintiffs on the

basis of negative employment references from both International

Paper and The Weissman Group is a legitimate, non-discriminatory

17

action.  Hill v. Metropolitan Gov't of Nashville, 54 Fed. Appx.
199, 201 (6th Cir. 2002).  The evidence and arguments proffered
by Plaintiffs, however, are insufficient to create an issue of
material fact on the issue of pretext.  Accordingly, summary
judgment in Smart Papers' favor with respect to the claims of
these Plaintiffs is appropriate.  Furthermore, Plaintiffs who
actually received job offers from Smart Papers have no evidence
that Smart Papers discriminated against them because of their
age.  Therefore, summary judgment against these claimants is
appropriate as well.

### A. The Failed Drug Tests

Plaintiffs argue that disqualifying them from
consideration for employment because of their failed drug tests
is a pretext for discrimination because Smart Papers later hired
younger applicants with prior criminal offenses, including
numerous applicants with prior convictions for driving under the
influence and one applicant who had a prior conviction for
marijuana possession.  Plaintiffs also point out that one
applicant had a prior conviction for manslaughter.

Whether or not these applicants engaged in prior
conduct which is worse than Plaintiffs' current drug usage is not
relevant to the issue of pretext.  The disqualifying factor at
issue was a positive drug screen.  As Smart Papers points out in
its brief, there were fifty-six applicants from International

18

Paper, ranging from age 38 to age 56, who failed their drug test. Smart Papers rejected every applicant who failed his or her drug test. See Doc. No. 105, Ex. 1, Maheu Aff. ¶ 12. Thus, Smart Papers treated all applicants from International Paper equally, regardless of age, with respect to failing the drug test. Moreover, subsequent applicants were also required to take and pass drug tests as a condition of employment, but there is no evidence that Smart Papers hired any substantially younger applicant who also failed his or her drug test. See Carpenter Dep. at 10; Hampton Dep. at 19-20. Thus, the record establishes that Smart Papers treated new job applicants the same as it did all of the other applicants, including Plaintiffs, with respect to the drug test requirement.

Finally, of the fourteen new applicants with prior criminal convictions identified by Plaintiff, three of them were within the protected class at the time of their hiring. See Plaint. Ex. 72.[4] At age 54, Bowling was actually older than the average age of the Plaintiffs, which is 51.18. See Fifth Amended Complaint ¶¶ 10-81. At ages 48 and 47, respectively, Crane and Willsey were not substantially younger than the average age of the 72 individual Plaintiffs.[5] Smart Papers also points out that

---

[4]    Fred Bowling was age 54. Barry Crane was age 48. James Willsey was 47.

[5]    In <u>Grosjean v. First Energy Corp.</u>, 349 F.3d 332 (6th Cir. 2003), the Sixth Circuit held that in an ADEA case, in the absence of direct evidence of discrimination, an age difference

19

it extended a job offer to Plaintiff Elmer Campbell, despite the
fact that he had a prior conviction for gross sexual imposition.
Campbell Dep. at 18-19.  In other words, Smart Papers treated
applicants within Plaintiffs' own age group equally as favorably
as it did substantially younger applicants with respect to prior
criminal convictions.  This clearly establishes that Smart Papers
did not use the drug test as a method to disqualify older
applicants from employment opportunities.

        Plaintiffs also challenge the reliability of using hair
samples to screen for drugs.  Plaintiffs claim that hair sample
testing is inaccurate because it does not show whether the
subject was impaired while on the job.  Plaintiffs further claim
that hair sample testing will net more women than men and more
African-Americans than Caucasians.  Plaintiffs also complain that
they were not afforded an opportunity to retest after they
failed.  These criticisms are all beside the point, however.  As
noted, Smart Papers treated each applicant, regardless of age,
the same with respect to the drug test - failure meant
disqualification.  There is no evidence that hair sample testing
is unfairly biased against older persons, which is the relevant
group (and not gender or race) for purposes of comparison.  Even
if there were false positives among the Plaintiffs, there is no
evidence that any applicant, much less substantially younger
ones, were given opportunities to retake the drug test.  It is

_____

of six years or less is not significant as a matter of law.  Id.

further irrelevant that hair sample testing does not show current drug usage or impairment on the job because the disqualifying factor was failing the test, and not whether any applicant was actually impaired on the job.

In short, it is not possible on this record for a reasonable person to infer that Smart Papers used drug testing to screen out older applicants. Accordingly, Smart Papers' motion for summary judgment with respect to the claims of those Plaintiffs who failed the drug test is well-taken and is **GRANTED**.

### B. Negative Reference Checks

As indicated above, forty-six Plaintiffs received negative job references and as a consequence were not hired by Smart Papers. Although, as Smart Papers points out in its reply brief, Plaintiffs appear to admit that the negative job references cost them jobs with Smart Papers, Plaintiffs still contend that the negative references were not sufficient for Smart Papers to reject them.

As evidence of pretext, Plaintiffs claim that they were negatively stereotyped during the interview process as being inflexible and unwilling to learn. Plaintiffs point out, for whatever weight it carries, that The Weissman Group interviewers had no training in guarding against ageist stereotypes during interviews. Plaintiffs also argue that the negative job references are pretexts for discrimination because Smart Papers

21

did not obtain employment references from the new applicants it hired after taking over the Mill and because it hired many new applicants with little or no experience working in paper mills. Thus, Plaintiffs argue, Smart Papers preferred to hire younger applicants who were objectively less qualified than them. Plaintiffs also claim that Smart Papers' hiring procedures were part of a nefarious plan to reduce the age of its workforce. Plaintiffs also contend that Smart Papers collected age data from applicants when it had no legitmate need to do so. None of these contentions is borne out by the record, however.

As far as being stereotyped as being inflexible and unwilling to learn, even if Plaintiffs did receive below average marks in these areas, there is no evidence that flexibility and willingness to learn were weighted more heavily in the hiring calculus than the five remaining factors - excellence oriented, productivity, dependability, team player, and safety awareness. As Smart Papers points out in its pleadings, the same hiring criteria under which Plaintiffs were rejected resulted in applicants over the age of 40 being hired at a higher rate than applicants under the age of 40. See Doc. No. 105, Maheu Aff. ¶ 12 (showing that whereas Smart Papers hired 67.3% of the applicants age 39 and under, it hired 72.05% of the applicants over age 40 and over).

22