Page 1

```
 1              UNITED STATES DISTRICT COURT
 2               SOUTHERN DISTRICT OF OHIO
 3                   WESTERN DIVISION
 4
 5    -----------------------------------
                                        :
 6    DORMAN ANGEL, et al.,             :
                                        :
 7            Plaintiffs,               :
                                        :
 8        vs.                           :    CASE NO.
                                        :    C-1-01-467
 9    UNITED PAPERWORKERS              :
      INTERNATIONAL UNION (PACE)        :
10    LOCAL 1967, et al.,               :
                                        :
11            Defendants.               :
                                        :
12    -----------------------------------
13
14        Deposition of:  KENNETH C. STANIFER
15        Taken:          By the Plaintiffs
                          Pursuant to Notice
16
          Date:           November 22nd, 2004
17
          Time:           Commencing at 10:00 a.m.
18
          Place:          Kircher, Robinson,
19                          & Welch
                          2300 Kroger Building
20                        Suite 2520
                          Cincinnati, Ohio  45202
21
          Before:         Jennifer Coats
22                        Notary Public - State of Ohio
23
24
25
```

COPY

Ace Reporting Services  (513) 241-3200
30 Garfield Place, Suite 620   Cincinnati, Ohio  45202

Page 2

1  APPEARANCES:
2
   On behalf of the plaintiffs:
3
      Paul K. Seibel, Esq.
4         of
      Jacobs, Kleinman, Seible
5       & McNally Co., L.P.A.
      2300 Kroger Building
6     1014 Vine Street
      Cincinnati, Ohio 45202
7
8
   On behalf of the plaintiffs:
9
      Mark J. Byrne, Esq.
10        of
      Jacobs, Kleinman, Seibel
11      & McNally Co., L.P.A.
      2300 Kroger Building
12    1014 Vine Street
      Cincinnati, Ohio 45202
13
14
   On behalf of PACE Union Local 1967:
15
      Robert I. Doggett, Esq.
16    6740 Clough Pike, Suite 200
      Cincinnati, Ohio 45244
17
18
   On behalf of PACE International Union:
19
      James B. Robinson, Esq.
20        of
      Kircher, Robins & Welch
21    1014 Vine Street, Suite 2520
      Cincinnati, Ohio 45202
22
23 On behalf of Smart Paper Co., Inc.:
24    Charles P. Groppe
          of
25    Morgan, Lewis & Bockius Co., L.L.P.
      1111 Pennsylvania, Avenue, NW

Page 3

1
   On behalf of International Paper:
2
      Vincent J. Miraglia
3     International Place
      6400 Poplar Avenue
4     Memphis, Tennessee 38197
5
   Also Present:
6
      Gerald P. Johnston
7
8           - - -
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1              INDEX
2
   KENNETH C. STANIFER                PAGE
3
   Cross-Examination by Mr. Byrne        5
4  Examination by Mr. Groppe           133
   Examination by Mr. Doggett          136
5  Further Cross-Examination by Mr. Byrne   145
   Further Examination by Mr. Doggett    148
6
7  EXHIBITS           MARKED  REFERENCED
8  Plaintiff's Exhibit 1    20     20
   Plaintiff's Exhibit 2    23     23
9  Plaintiff's Exhibit 3    24     24
   Plaintiff's Exhibit 4    40     40
10 Plaintiff's Exhibit 5    83     83
   Plaintiff's Exhibit 6   103    103
11 Plaintiff's Exhibit 7   103    115
12
              - - -
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1          KENNETH C. STANIFER
2  of lawful age, a witness herein, being first duly
3  sworn as hereinafter certified, was examined and
4  deposed as follows:
5          CROSS-EXAMINATION
6  BY MR. BYRNE:
7      Q.  For the record, sir, could you state your
8  name and spell your last name?
9      A.  Yes, Kenneth C. Stanifer S-t-a-n-i-f-e-r.
10     Q.  My name is Mike Byrne.  I represent a
11 number of individuals who have sued PACE
12 International and PACE Local.  All I'm going to do
13 today is ask you some questions about your
14 involvement in the situation that arose back in 2001
15 with International Paper.
16         If there's any time that you don't
17 understand a question that I ask, let me know and I
18 will try to rephrase it for you.  A couple of other
19 simple rules, she can only take down one person at a
20 time so let me finish my question before you start
21 your answer.  I'll try to extend the same courtesy to
22 you and allow you to finish your answer before I
23 start another question.
24         And also, she needs a verbal answer to any
25 question I ask because she can't take down a nod of

2 (Pages 2 to 5)

Page 130

1    Q.  Just a couple of other questions, sir.
2  With regard to the Springdale closure that you talked
3  about?
4    A.  Yes.
5    Q.  I think you talked about the fact that you
6  were a part of that negotiation with regard to
7  severance?
8    A.  That's correct.
9    Q.  Was there any collective bargaining
10  agreement in existence that talked about the amount
11  of severance that the individuals who were
12  employees --
13    A.  No, there wasn't.
14    Q.  At Springdale would obtain severance?
15    A.  No there, wasn't.
16    Q.  Was that when you negotiated the 60 days,
17  was that something that the union proposed?
18    A.  60 hours.
19    Q.  60 hours, excuse me, I'm sorry.  60 hours.
20    A.  Yes, it was.
21    Q.  And IP excepted that?
22    A.  Yes, they did.
23    Q.  And that was for all of the employees?
24    A.  Yes.  But they all lost their jobs; no one
25  was rehired by International Paper or any other

Page 131

1  entity.
2    Q.  Well, nobody in this case, with regard to
3  the B Street mill in Hamilton was rehired by IP
4  either, were they?
5    A.  They were hired by Smart Paper, the
6  successor.
7    Q.  Are you telling me that Smart Paper and
8  IP --
9    A.  No, I'm not telling you they're one in the
10  same.
11    MR. ROBINSON:  I'd like to strike the
12  question.
13    Q.  So in this case, it's your understanding,
14  is it not, that no one was hired by IP, weren't they?
15    A.  That's correct.
16    Q.  No individual who was a bargaining unit
17  employee was hired by IP when IP sold the mill to
18  Smart?
19    A.  At that location?  No.
20    Q.  And with regard to your actions in the
21  execution of the severance agreement, has anybody
22  ever said anything to you or imposed any discipline
23  on you for doing that?
24    A.  For doing my job?  No.
25    Q.  I understand that it's your position that

Page 132

1  you were doing your job when you signed the
2  agreement.
3    A.  That's correct.
4    Q.  Has anyone ever indicated to you that that
5  maybe wasn't your job or maybe you shouldn't have
6  done that?
7    A.  No.
8    Q.  Is there any other agreement while you
9  have been the international rep that was -- that
10  existed between IP and the union which you signed on
11  behalf of the union without getting ratification?
12    A.  This is the only one because my other
13  dealings with IP were collective bargaining
14  agreements, that required ratification.
15    Q.  So it's your position that in all of the
16  years that you were international rep from, I think
17  you said, '86 to the present?
18    A.  That's correct.
19    Q.  The only time that there was an agreement
20  that was not a collective bargaining agreement
21  between IP or its predecessor, Champion, was this
22  effects bargaining agreement; is that right?
23    A.  That's the only one that I signed without
24  ratification.  If there was -- as I stated earlier,
25  if there was an amendment to the collective

Page 133

1  bargaining agreement, it demanded, in my opinion,
2  ratification.
3    Q.  All right.  And has any -- strike that.
4  Has in your -- as a part of this International Paper
5  committee, is there any other location that you're
6  aware of that wherein International Paper sold the
7  assets of a mill and individuals continued to be
8  employed there?
9    A.  No, there was not.  I don't know, they may
10  do it.  Hell, I don't know what they do.
11    Q.  Okay.  That's all I have sir.
12    A.  Thank you.
13    Q.  Thank you.
14    MR. DOGGETT:  I have a couple of
15  questions.
16    (Off the record.)
17    EXAMINATION
18  BY MR. GROPPE:
19    Q.  Mr. Stanifer, I'm Charlie Groppe.  I told
20  you before I started, I represent Smart Papers in the
21  case and I just have one or two questions for you.
22  You said you met with Mr. Cohen?
23    A.  No.  No, I called him.
24    Q.  I'm sorry, you called Mr. Cohen, was that
25  about January 9th?

34 (Pages 130 to 133)

Page 134

1    A.  Yes.
2    Q.  Did you have any other conversations with
3  Mr. Cohen between January 9th and when Smart Papers
4  actually took over the mill in February of 2001?
5    A.  He attended a couple of negotiating
6  sessions.
7    Q.  And they were negotiating sessions
8  involving Smart Paper?
9    A.  Smart Paper and Local 1967, yes.
10    Q.  And they were about trying to reach some
11  type of agreement?
12    A.  Wage, hours and working conditions, yes.
13    Q.  Did you have any conversation with
14  Mr. Cohen about the effects bargaining agreement?
15    A.  No, I did not.
16    Q.  Did you have any conversations with
17  anybody from Smart Paper about the effects bargaining
18  agreement?
19    A.  No.
20    Q.  You testified a little bit about your
21  concern about people that failed the drug test?
22    A.  Correct.
23    Q.  Would they be entitled to severance pages?
24    A.  Yes, they ultimately received a severance
25  package when I asked Mr. Stewart, how many lawsuits

Page 135

1  do you want filed?
2    Q.  And was any of the language in the effects
3  bargaining agreement changed to allow those people to
4  get severance if they qualified?
5    A.  It speaks in the severance package that —
6    Q.  I think it's Exhibit 4?
7    A.  Yeah, employees who did not — who do
8  receive an employment offer from Smart Paper will not
9  be entitled to severance pay unless they are
10  terminated from Smart Paper through no fault of their
11  own within 18 months of the sale date.
12    Q.  People that applied for a job that failed
13  the drug test, they wouldn't have been offered
14  employment?
15    A.  No, they wouldn't.
16    Q.  But they'd still be entitled to severance?
17    A.  Yes, because that's what Mr. Stewart
18  agreed to.  Regardless of the reason one did not
19  receive employment offer, they would receive a
20  severance package.
21    Q.  That's something you negotiated on their
22  behalf?
23    A.  Yes.
24    Q.  Now you also testified about an agreement
25  between IP and Smart Paper.  Have you ever seen that

Page 136

1  agreement -- the sale agreement?
2    A.  No, I haven't.
3    Q.  Have you -- you've never reviewed it?
4    A.  No.
5    Q.  You don't have any idea what Smart Papers
6  -- strike that.  Do you have any idea or did you know
7  anything about how many employees Smart Paper wanted
8  to hire when it took over the mill in February of
9  2001?
10    A.  I didn't know the exact number.  And from
11  experience, I knew that they would have to hire a
12  large number of employees to operate the mill.
13    Q.  But Smart Paper told you how many they
14  intended to hire?
15    A.  No.
16    Q.  Did Smart Paper tell you what criteria it
17  was going to use when it hired people?
18    A.  No.
19    Q.  Thanks, Mr. Stanifer.  I have no further
20  questions.
21          EXAMINATION
22  BY MR. ROBINSON:
23    Q.  You testified about agreements with IP.
24  Over the years, did you handle grievances with IP?
25    A.  Oh, absolutely.

Page 137

1    Q.  Did you reach agreements on any of those
2  grievances?
3    A.  Sure.
4    Q.  Did you have membership votes on those
5  grievances?
6    A.  No.
7    Q.  Or on the grievance agreements resolving
8  those grievances?
9    A.  No.
10    Q.  When IP took over from Champion, if you
11  know, did they buy the mill assets or did they buy
12  the whole shebang?
13    A.  As I understood, they bought all of
14  International.
15    Q.  It was a stock sale?
16    A.  Yes, stock sale plus cash, I think.
17    Q.  Okay, thank you.
18          EXAMINATION
19  BY MR. DOGGETT:
20    Q.  I only have a couple of questions to clear
21  up --
22      MR. BYRNE:  Objection.  I just want to let
23  you know I was going to make one.
24      MR. DOGGETT:  Sorry. I went to clear up my
25  own -- I don't want -- I don't hear too well,

35 (Pages 134 to 137)