1

1

1     1              UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF OHIO
1     2                  WESTERN DIVISION

1     3

1     4   PACE Local Union 5-1067,     :
      et. al.,               :   Case No. C-1-02-301
1     5                    :     (CONFIDENTIAL)
           Plaintiffs,         :
1     6                    :
      vs.                  :   Cincinnati, Ohio
1     7                    :     December 18, 2002
      INTERNATIONAL PAPER CO.,      :
1     8                    :
           Defendant.          :
1     9

1    10

1    11

1    12

1    13            Deposition of MILTON LEWIS, a

1    14   witness herein, taken as upon cross-examination by the

1    15   Plaintiffs, and pursuant to the Federal Rules of

1    16   Civil Procedure, agreement of counsel, and stipulations

1    17   hereinafter set forth, at the offices of Robert I. Doggett,

1    18   Esq., 215 E. Ninth Street, 6th Floor, Cincinnati, Ohio,

1    19   45202, on the 18th day of December, 2002, at 3:05 p.m.,

1    20   before Julie A. Patrick, a Notary Public for the State of

1    21   Ohio.

1    22

1    23     TRI-COUNTY COURT REPORTING AND VIDEOTAPE SERVICE

1    24            95 S. FOURTH STREET
                 BATAVIA, OHIO 45103
1    25             (513) 732-1477

1                                               2

2     1   APPEARANCES:

2     2         On behalf of PACE Local Union:
      ROBERT I. DOGGETT, ESQ.

| | | |
|---|---|---|
| 2 | 3 | 215 E. Ninth Street, 6th Floor<br>Cincinnati, Ohio  45202 |
| 2 | 4 | |
| | | On behalf of International Paper: |
| 2 | 5 | VINCENT J. MIRAGLIA, Esq.<br>W. CARTER YOUNGER, Esq. |
| 2 | 6 | McGuire Woods, LLP<br>One James Center |
| 2 | 7 | 901 East Cary Street<br>Richmond, VA  23219-4030 |
| 2 | 8 | |
| | | On behalf of Smart Paper: |
| 2 | 9 | STANLEY F. LECHNER, ESQ.<br>Morgan, Lewis & Bockius, LLP |
| 2 | 10 | 1111 Pennsylvania Avenue, NW<br>Washington, DC  20004 |
| 2 | 11 | |
| | | Also present:    Timothy D. Bray |
| 2 | 12 | Ron Schweitzer |
| 2 | 13 | |

2   14                    S T I P U L A T I O N S

2   15              It is stipulated and agreed by and amongst

2   16   counsel for the respective parties that the deposition of

2   17   MILTON LEWIS, a witness herein, called as upon

2   18   cross-examination by the Plaintiffs, may be taken at this

2   19   time and place pursuant to the Federal Rules of Civil

2   20   Procedure, agreement of counsel; that the deposition may be

2   21   recorded in stenotype by the Notary Public, Julie A.

2   22   Patrick, who is also the court reporter, and transcribed out

2   23   of the presence of the witness; and that signature of the

2   24   deponent was requested and shall be affixed outside the

2   25   presence of the Notary Public.

2                                                                    3

3   1                        I N D E X

3   2

| | | WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|---|---|
| 3 | 3 | WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
| 3 | 4 | MILTON LEWIS | | | | |
| 3 | 5 | by Mr. Doggett: | | 4 | | 45 |
| 3 | 6 | by Mr. Younger: | | 27 | | |

```
3     7
3     8
3     9
3    10  PLAINTIFFS' EXHIBITS              MARKED
3    11  1:                                  8
3    12  1-A - 1-H:                          9
3    13  2:                                 16
3    14  3:                                 17
3    15  4:                                 22
3    16  5:                                 24
3    17  6:                                 26
3    18
3    19
3    20
3    21
3    22
3    23
3    24
3    25
3                                                          4
4     1                  MILTON LEWIS,
4     2  a witness herein, being of lawful age, after having been
4     3  duly cautioned and sworn, was examined and deposed as
4     4  follows:
4     5                  CROSS-EXAMINATION
4     6  BY MR. DOGGETT:
4     7          Q.   Would you state your name and address, sir.
4     8          A.   My name is Milton E. Lewis, L-E-W-I-S.
4     9               MR. LECHNER:  Mr. Doggett, before we get
```

9   25        Q.   You saw this paper?

9                                                                      10

10   1        A.   Yes.

10   2        Q.   And it says, "I hereby accept offer", and "I

10   3   hereby decline the offer", right?

10   4        A.   I saw this subsequent to that.

10   5        Q.   Yeah.  Okay.  And let's go to 1-C where Jack

10   6   Ratliff's response says, "I hereby accept the offer", and

10   7   then he hand wrote, "I will be looking for other employment

10   8   while there, as the $8.80 reduction in my pay rate after 42

10   9   loyal years of service is devastating to my family."  You

10   10  saw this before?

10   11       A.   I've seen this before.

10   12       Q.   And then, how about the Exhibit 1-E, where

10   13  Jimmy Taylor said, I accept job under protest and so on.

10   14  Have you seen that?

10   15       A.   Yes.

10   16       Q.   And then, 1-G is Michael Thomas saying -- he

10   17  checks off, I accept the job.  And you've seen all of these?

10   18       A.   Yes.

10   19       Q.   Now, would you tell me -- tell us the

10   20  circumstances -- identify whether or not that's -- that this

10   21  agreement was prepared -- it's dated February 13, 2001,

10   22  which is Plaintiffs' Lewis Exhibit 1-B, 1-D, 1-F, and 1-H,

10   23  how did it come about that you -- that's your signature on

10   24  these agreements, is it not?

10   25       A.   Yes, it is.

10                                                                     11

11   1        Q.   How did that come about that, for Born,

11   2   Ratliff, Taylor, and Thomas, these agreements were signed --

11   3         A.   The way that this came about was, my direct

11   4   boss at the time was Annetta Johnson, who directed me to

11   5   contact Born, Taylor, and the rest of these folks in this

11   6   exhibit.

11   7         Q.   We'll call them the four, okay?

11   8         A.   To ascertain whether they would be interested

11   9   in leaving Smart Papers, whether they would like for Smart

11   10  Papers to rescind their employment offer.

11   11        Q.   Now, you knew, then, from talking to Annetta,

11   12  that they had been offered a job?

11   13        A.   Yes.

11   14        Q.   And she wanted you to contact them to see if

11   15  they wanted to agree that Smart should rescind its offer?

11   16        A.   Yes.

11   17        Q.   Then what did you do?

11   18        A.   I went out to the bailer area, and I think I

11   19  talked to Joe Born and -- maybe it was Jimmy Taylor.  I am

11   20  not too familiar with them personally, but -- I had never

11   21  met them before.  And I told them that I would like to see

11   22  them in my office, including the other people on this list.

11   23  And I gave them the --

11   24        Q.   All four of them?

11   25        A.   Yes, the list of these folks.  And I wanted to

11                                                              12

12   1   see them in my office.  I needed to talk with them regarding

12   2   their employment.

12   3         Q.   All four of them together?

12   4         A.   Yes.

12   5        Q.   Then what happened?

12   6        A.   I can't recall whether it was the same day or

12   7   the next day, but they came to my office.  And I told them

12   8   that they had contacted Annetta and that they were

12   9   interested in leaving Smart Papers, and that Smart Papers

12   10  would consider withdrawing their employment offer.  And if

12   11  they were interested in that, they should let me know.  And

12   12  I gave them a couple of days to get back to me.

12   13       Q.   Okay.  I notice the date of the agreement is

12   14  February 13, 2001.  And February 13, 2001, was a Tuesday.

12   15  And it is -- did they -- the agreements -- those four

12   16  agreements were prepared -- dated February 13.  Did they

12   17  sign them on a later date or the same day; do you recall?

12   18       A.   Well, maybe they signed them the same day.  I

12   19  just have it in my mind that we gave them some time to sign

12   20  it.

12   21       Q.   And maybe they didn't need it, huh?  Maybe

12   22  they decided on the spot?

12   23       A.   Maybe they did, yeah.

12   24       Q.   Now then, Born, Ratliff, Taylor, and Thomas,

12   25  the people listed in Plaintiffs' Exhibit Lewis Exhibit 1-A

12                                                            13

13   1   through H, never did work for Smart, right?

13   2        A.   Yes, they did.

13   3        Q.   Oh, they did work for Smart?

13   4        A.   Yes.

13   5        Q.   A day or two or what?

13   6        A.   They were on the job.  I know the two people

13   7   that I contacted was in the area when I contacted them, Born

13   8   and Taylor.

13   9          Q.   So -- okay.  So they would have got some -- do

13  10   you know how long they stayed on the job, a day or two or a

13  11   week?

13  12          A.   It must have been a day or so.  It was the

13  13   13th -- if this was signed on the 13th, I think we got

13  14   started on the 12th or the 13th of February.  So they were

13  15   on the job.

13  16          Q.   Now, I wonder -- I would like to go back.  If

13  17   we can get out Plaintiffs' Weissman Exhibit 15?  Do you have

13  18   it?

13  19          A.   Yes.

13  20          Q.   I'll direct you -- down in the lower right

13  21   corner, are there page numbers?  It says IP-100119.

13  22          A.   You know, I have 110.  110 at the bottom of the

13  23   page.

13  24          Q.   Yeah.  I'm looking at the one that starts with

13  25   "I.P. hourly employees without job offers from Smart

13                                                                  14

14   1   Papers".

14   2          A.   I got it.

14   3          Q.   Do you see that?

14   4          A.   Yes.

14   5          Q.   Now, do you see down alphabetically, Born,

14   6   Joseph O., is on the list of I.P. hourly employees without

14   7   job offers from Smart Papers, right?

14   8          A.   Yes.

14   9          Q.   And over on page P-100121, three pages later,

14  10   do you see Jack Ratliff?

30    1            Q.    Okay.

30    2            A.    And when she came here, I went to Illinois as

30    3    vice-president and general counsel for Parklin College

30    4    Community College, District Number 508.

30    5            Q.    And then, where did you go from there?

30    6            A.    I came back to Cincinnati in 1994 and started

30    7    to teach at the University of Cincinnati.

30    8            Q.    What did you teach?

30    9            A.    I taught over in Batavia.  I taught law

30    10   courses in Batavia.

30    11           Q.    Did you teach some employment law course over

30    12   there?

30    13           A.    Employment, labor contracts.

30    14           Q.    And then, after you were teaching law, what

30    15   did you do next?

30    16           A.    Well, that's when I came to Hamilton.

30    17           Q.    And that was with Champion at that time?

30    18           A.    Yes, it was Champion at that time.

30    19           Q.    And when did you become general counsel of

30    20   Smart?

30    21           A.    March 23rd of 2001.

30    22           Q.    Now,, let me direct your attention to Exhibit

30    23   Lewis 1-E.  It was one of the response documents.

30    24           A.    E?

30    25           Q.    Right.  Yes, sir, 1-E.  This is a response,

                                                          31

31    1    and it's from Jimmy L. Taylor is the one that I've got here.

31    2            A.    Yes.

31    3            Q.    Is that accurate?

31  4          A.   It's accurate.

31  5          Q.   I was just reading up at the top, there is

31  6  some handwriting, it says, "Under protest because my

31  7  department was done away and I was in maintenance for 29

31  8  years.  We would have been better off with a severance."  Do

31  9  you know what Mr. Taylor was referring to when he says "his

31  10  department was done away with"?

31  11         A.   Yes.  Mr. Taylor and Mr. Born and other

31  12  employees -- specifically Taylor, they were mobile equipment

31  13  operators, I think, under Champion, I.P., and those jobs

31  14  were eliminated when we came over as Smart Papers.

31  15         Q.   So, when you met with Mr. Taylor and, I think,

31  16  Born and the other individuals, was it your understanding

31  17  that their department had been eliminated at Smart?

31  18         A.   I was not told directly by Annetta, but I did

31  19  find out, you know, when I was talking to these people, from

31  20  someone in my office that the new structure eliminated these

31  21  jobs, and so I was aware.

31  22         Q.   And so that would apply to Mr. Taylor and Mr.

31  23  Born.  Would that apply to Mr. Ratliff?  Now, he's on page

31  24  1-C.

31  25         A.   I don't know if Mr. Ratliff was mobile

                                                          32

32  1  equipment or one of the other positions, like trash haulers,

32  2  and -- I think Randy Tackett was in fire control.  There was

32  3  a variety of positions that were not brought over with Smart

32  4  Papers.

32  5          Q.   So Smart, it was your understanding, did not

32  6  have the job there that they had been doing before?

32    7          A.    Absolutely.

32    8          Q.    And that was a position elimination?

32    9          A.    A position elimination.

32    10         Q.    All right, sir.  Now, let me direction your

32    11   attention to Plaintiffs' Weissman Number 15.  And that's

32    12   this list.

32    13         A.    Got it.

32    14         Q.    At some point, I believe, you testified that

32    15   Annetta Johnson was the one responsible for communicating to

32    16   International Paper who had offers and who didn't; is that

32    17   correct?  I think you said something like that.

32    18         A.    I recall Counselor Doggett saying that.  She

32    19   was the head of HR.  She was the vice-president for human

32    20   resources at the time.  So, if anyone was going to

32    21   communicate with I.P., it would have been her.  But I don't

32    22   have independent knowledge of what she did.

32    23         Q.    Well, are you aware of any communications to

32    24   I.P. about the individuals that you asked about and the

32    25   circumstances under which they did or didn't have offers,

                                                               33

33    1    other than Weissman Number 15?

33    2          A.    After I gave these releases back to Annetta, I

33    3    have no idea what the procedure was.

33    4          Q.    Now, on the releases -- for example, let's

33    5    take a look at Plaintiffs' Lewis Number 1-F, that's Jimmy

33    6    Taylor's release.  I take it, then, that this agreement,

33    7    from the language of it, is a confidential agreement between

33    8    Mr. Taylor and Smart Papers; is that correct?

33    9          A.    That is correct.

33    10              Q.    International Paper was not a party to this

33    11    agreement, were they?

33    12              A.    No, they were not.

33    13              Q.    In fact, it would have been a violation of

33    14    this agreement, which would subject Mr. Taylor to forfeiture

33    15    and court costs and attorney's fees, if he would have

33    16    disclosed this to International Paper; isn't that true?

33    17              A.    That is correct.

33    18              Q.    And similarly, Smart treated this as

33    19    confidential, too, didn't they?

33    20              A.    Yes, they did.

33    21              Q.    So, to your knowledge, none of this agreement

33    22    by Mr. Taylor was communicated to International Paper, was

33    23    it?

33    24              A.    It was not, to my knowledge.

33    25              Q.    That would have breached the confidentiality,

                                                              34

34    1    wouldn't it?

34    2              A.    Absolutely.

34    3              Q.    And isn't the same true for Exhibit 1-H by Mr.

34    4    Thomas?  He could not disclose that to International Paper,

34    5    this agreement, nor would Smart Papers disclose that?

34    6              A.    That is correct.

34    7              Q.    And then, Mr. Born is shown, it's Lewis 1-B,

34    8    the same question.  International Paper was not a party to

34    9    Mr. Born's agreement, correct?

34    10              A.    No, they were not.

34    11              Q.    In fact, it would have been a violation of

34    12    this agreement that would subject Mr. Born to liability were