UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DORMAN ANGEL, et al.      :    Case No. C-1-01 467
                      (BECKWITH, JUDGE)

    Plaintiffs      :

          vs.        REPLY MEMORANDUM OF DEFENDANT
                      PACE LOCAL 5-1967, SUPPORTING ITS
PACE LOCAL 5-1967, and   :    MOTION FOR SUMMARY JUDGMENT
PAPER, ALLIED INDUSTRIAL,
CHEMICAL & ENERGY WORKERS
INTERNATIONAL UNION,    :
AFL-CIO, and

INTERNATIONAL PAPER COMPANY
and  SMART PAPER, LLC    :

       Defendants

STATEMENT OF CASE

In Plaintiffs' memorandum contra our motion for summary judgment, they rely totally upon their claim that they were entitled to severance pay provided by the 1996 CBA and its Policy #817.  They claim that the Unions "negotiated away" this entitlement and thereby breached their duty of fair representation (DFR), by agreeing to the Effects Bargaining Package (herein called the EBP) without a membership vote on it.

The Unions' motions to dismiss could challenge only the allegations of Plaintiffs' Second Amended Complaint.  Now, undisputed facts from discovery show that IP owed them no severance pay under the 1996 Policy #817, Plaintiffs' claims fail for three reasons. (1) IP exercised its right to terminate Policy #817, (2) Policy #817 provided severance pay only for layoffs due to mill reconfiguration, not for mill closing and (3) Plaintiffs failed to

1

file grievances on their claim.

## STATEMENT OF UNDISPUTED FACTS

1. <u>IP owed no severance pay under Policy #817.</u>  Plaintiffs' claim for severance pay from the 1993 CBA, has been dismissed because it promised no severance pay, and the parties agreed to severance pay in the 1996 contract and Policy #817.  The 1996 agreement provided:

"Part V. <u>Summary Plan Description</u>, Attached hereto as Exhibit IV **and incorporated herein by reference** is an ERISA Summary Plan Description Document for Plan #817." (1996 agreement, Bray 12/17/04 depo., Exhibit 1, page 5)

Policy #817 for Severance Plan #817 in turn provided (Policy #817, Bray 12/17/04 depo., Exhibit 2):

<u>Section 1, Definitions.</u>

1.1 <u>Administrator</u> is the Company.

1.2 <u>Company</u> is Champion International Corporation.

1.6 (Eligible employees are those)
1.6(b) whose employment is or will be involuntarily terminated **as a result of the Hamilton Mill Reconfiguration** during the effective date ....

1.10 <u>Reconfiguration </u> is the elimination of positions as a result of cost reductions at the Hamilton Mill.
&ast; &ast; &ast; &ast;
<u>Section 2 Severance Benefits</u>.  (List details of severance pay calculations).
&ast; &ast; &ast; &ast;
<u>Section 9 Amendment and Termination</u>:
The Company reserves the right **to amend or terminate** the Policy at any time." (Id. Bray 12/17/04 depo. Exhibit 2).

(1) IP exercised its right to terminate Policy #817 as appears in the EBP. (2) Policy #817 provided severance pay only for layoffs due to mill reconfiguration.  But to depart, IP still had to have

2

Union agreement to settle 178 grievances, which they did. (See EBP, Bray 12/17/04 depo. Exhibits 3 and 4, listing 178 grievances, more numbers were duplications). Plaintiffs now claim that grievance settlements were not part of the EBP. (Memo. contra p. 7, fn 5). But IP needed to have these grievances settled and as noted the EBP states (Bray 12/17/04 depo. Ex. 3):

> "All outstanding grievances will be considered settled in accordance with agreed upon terms." (id. page three).

2. <u>No membership vote was had on the EBP</u>. No membership vote was taken on the EBP when it was explained to the union membership in two meetings on January 26, 2001.  Within his authority to interpret the PACE IU Constitution, PACE IU Vice President Gerald Johnston had advised IU Rep. Ken Stanifer that the EBP was not a CBA, but a settlement of effects bargaining, complaints, a dispute, and grievances, therefore no vote was required. (Johnston depo. pp. 12-14). Plaintiffs assert that "no vote" was Stanifer's conclusion and that he did not consult an attorney. (Memo Contra, p. 9).  But it was Johnston's conclusion, not Stanifer's, and Johnston had checked with PACE IU legal counsel Lynn Agee to confirm no vote here was required. (Johnston depo. pp. 13-14).

3. <u>Plaintiffs' failure to exhaust internal remedies</u>.  None of the Plaintiffs filed a grievance under the CBA's ¶¶8.01 et seq. or under Policy #817's appeals for denial of severance pay. (Bray 12/17/04 depo. p. 21-22, and Ex. 2, p. 6,7 ¶). On this motion, we did not contend that internal union appeals bar their claims.

3

ARGUMENT

1. <u>Plaintiffs were not entitled to severance pay them claim</u>.

Plaintiffs claim that the Unions negotiated away their right to severance pay under the 1996 agreement and Policy #817. But as noted in our main brief IP (which is the "Company" per ¶1.2 of Policy #817) had the reserved right to terminate severance pay per Policy #817, Section 9. (Bray depo. 1217/04, Ex. 2). However, referring to ¶3 of the first unnumbered page of Policy #817, Plaintiffs claim that only the Pension Committee or its delegate may terminate Policy #817 and there is no evidence they did this.

This claim would render nugatory the provision giving **the Company** (Champion/IP per Policy #817, ¶1.2 above) the right to terminate the Policy at any time. There is no reason that the first reference to a Pension Committee' right to terminate should nullify the Company's separate right to terminate the policy. Either or both entities could terminate, and there are different reasons each might want to. Here, IP had good reason to terminate Policy #817, wanting to be sure there could be no claim it owed severance pay to all those employees who got jobs or refused to apply for a job or refused jobs offered by Smart Papers. IP exercised its right under Section 9, Policy #817 to terminate its severance pay provisions at any time, **without need for union agreement** in the EBP, which stated:

"The Union agrees that Severance Program #817, or any other Severance Program, does not apply and that this severance agreement is the only severance agreement applicable to the

4

employees of the Hamilton B Street Facility." (Bray 12/17/04 depo.,
Exhibit 3, ¶4 page one).

* * * *

"All outstanding grievances will be considered settled in
accordance with agreed upon terms." (id. page three).

Plaintiffs claim that IP had offered all employees severance
pay of 40 hours times years of service which they claim the Unions
negotiated away with their successful counter offer of 60 hours
times years of service. (Memo contra p. 8 and 18). They cite Tom
Stewart's deposition (p. 62), where Union Counsel asked: "Why did
you agree to pay severance pay **to some people?**," and Stewart
answered it was a matter of Company policy. (Ibid). Plaintiffs'
attempt to stretch "some people" to "all employees" utterly fails.
Further, as Stewart testified, IP's offer was to pay severance pay
only to those who applied for jobs with Smart and were not offered
a job, not to all. (Stewart depo. 35, 41, 48). It is undisputed
that the Unions proposed severance pay for all employees. (See
Stanifer depo.; see Stewart depo. pp. 33 and 48). The Unions had
no reason to trade severance pay for all employees, which was never
offered, for more pay for less people.

2. <u>The mill reconfiguration was completed in 1997.</u> The
second reason Plaintiffs have no claim under Policy #817 is that it
provided severance pay only to those involuntarily terminated from
the mill due to reconfiguration which was completed in early 1997.
[Bray 12/17/04 depo., 13-14, and Ex. 2). Per Policy #817,
definition ¶ 1.10 <u>Reconfiguration </u> is the elimination of positions
as a result of cost reductions at the Hamilton Mill, and it was

completed in early 1997. (Bray 12/17/04 depo. pp 8-13, 26).  As
President of Local 1967, Bray was on the Transition Committee which
met weekly to administer the mill reconfiguration, and voluntary
and involuntary layoffs. (Id. pp. 8-13).  Bray knew that the
reconfiguration was over by early 1997. (Bray depo. Id. pp. 13,
26).  The details of mill reconfiguration were written specifics on
how departments were going to be reduced and job changes. (Id. pp.
26-27).[1]  Per Policy #817, only those employees terminated because
of the reconfiguration were made eligible for severance pay per
¶1.6 (b) Ex. 2]. In their memorandum contra Plaintiffs offered no
rebuttal to this second reason they had no claim for severance pay
under Policy #817.  Reconfiguration was over.

    3. <u>The Unions breached no duty of fair representation</u>.

<u>Vaca v. Sipes</u>, 386 U.S. 171, (1967) and <u>White v. Anchor Motor
Freight</u>, 899 F.2d 555, 559 (6th Cir. 1990), hold that if the
claimed employer breach of the CBA fails, the DFR claim must also
fail.  The Court dismissed Plaintiffs' hybrid §301/DFR claims for
severance pay in Counts II and V, holding that it had no
jurisdiction to invalidate the EBP, a §301 contract, and thus IP
breached no contract. (Decision pp. 17, 30 & 40).  But it is now
conclusive that IP did not breach Policy #817, first with its right
to terminate the Policy #817's severance pay and second because
reconfiguration had been completed in 1997, the end of severance

---

    [1] Although we had the lengthy reconfiguration document at
Bray's deposition (previously furnished Plaintiffs' counsel), he
did not request that it be entered as an exhibit. (Id. p. 26).

pay.  This is a far stronger reason to dismiss Plaintiffs' claims
that the Unions negotiated away severance pay than that the Court
lacked jurisdiction to hold a §301 contact invalid.  Their breach
of DFR claim also fails because the Unions' agreeing to the EBP was
not irrational.  <u>Airline Pilots v. O'Neill</u>, 499 US 65, (1991).


    4.  <u>The Effects Bargaining Package was not a collective
bargaining agreement</u>.  PACE IU Vice President Gerald Johnston had
interpreted the PACE IU constitution as meaning that the EBP was
not a CBA, but a settlement of effects bargaining, complaints, a
dispute, and grievances, therefore no vote was required.  He had
confirmed this with PACE IU counsel. (Johnston depo. pp. 12-14).
While others might consider the EBP to be a collective bargaining
agreement, this was a term of art in the PACE IU constitution which
no one else was is in a position to interpret.  It is what "CBA"
meant to PACE, not to others.  And despite the Court's early
opinion on the motions to dismiss, the EBP and many §301 contracts
are not CBA's.  See  <u>In re General Motors Corp.</u>, 3 F.3d 980 (6th
Cir. 1993), reversing a remand order of the district court holding
that an EAP was not a §301 contract, the Sixth Circuit stated:

        "The term 'contract' as used in Section 301 of the LMRA
    is not limited to collective bargaining agreements but can embrace
    understandings **other than usually understood as collective bargaining
    agreements**. <u>Stevens v. Employer - Teamsters ...Pension Fund</u>, 979
    F.2d 444, 457 (6th Cir. 1992, <u>Apponi v. Sunshine Biscuits, Inc.</u>,
    809 F.2d 1210, 1215 (6th Cir. 1987).(pension agreement was a §301
    contract, not a CBA hence no exhaustion of CBA grievance procedure
    required).

For the clearest holding that §301 contracts like the EBP are not CBA's see <u>Heheman v. E.W. Scripps</u>, 661 F.2d 1115 (6th Cir. 1981), in which the Sixth Circuit held that a scanner job security agreement guaranteeing printers' life time jobs was not part of the parties's CBA. It reversed the District Court's decision that the scanner agreement expired with the CBA. Rejecting Scripps' contention that since this agreement incorporated portions of the CBA and thus was part of the CBA, the Sixth Circuit stated:

> "[A] reference by the contracting parties to an extraneous writing for a particular purpose makes it a part of their agreement only for the purpose specified (citing <u>Guerini Stone Co. v PJ Carlin</u>, 240 US 264, 277) (and) prevents the incorporation into the Scanner Agreement of the expiration date of the collective bargaining agreement."
> <u>Heheman v. E.W. Scripps</u>, 661 F.2d 1115 (6th Cir. 1981).

The same result was reached in <u>Detroit Typographical Union v. Detroit Newspaper Agy.</u>, 283 F.2d 779 (6th Cir. 2002), where the CBA had expired, there was a strike, and the employees exercised their right to return to work under a similar job security agreement. Both of these cases held that these separate job security agreements were §301 contracts but not part of a CBA, that these agreements were on-going and did not expire with the CBA. Here, the EBP ended IP's relation with the Unions and its employees permanently.

    5. <u>No membership vote was required on the EBP</u>. Having exercised its reserved right in the EBP per 1996 Policy #817, Section 9, to amend or terminate its severance pay provisions without union agreement, IP still needed union agreement to settle

178 outstanding grievances.  This took two weeks to complete. (See Bray 12/17/04 depo. pp. 14-16, and Exhibits 3 and 4, listing 178 grievances settled). Thus, the main agreement feature of the EBP was settlement of these 178 grievances.  Plaintiffs claim denial of a right to a vote on the EBP as the Unions' breach of their DFR. (2nd Am Complaint, Count I, ¶ 36). As now shown, the EBP settled 178 outstanding grievances, and the PACE I U Constitution, ARTICLE XVI, Section 3, does not require a membership vote on settlement of disputes and grievances, stating:

> "The International Union or Local Union, as the case may be, acting as the exclusive collective bargaining representative of the members, is irrevocably authorized and empowered by each member to present, negotiate and settle any and **all grievances, complaints and disputes** arising out of the relationship of a member and his or her employer." (PACE International Union Constitution, ARTICLE XVI, Section 3, pages 50-51. (2d Am. Complaint, Exhibit E, pp. 50-51).

The EBP did not provide for employees' future wages, hours and working conditions as the 1990, 1993 and 1996 CBA's did, but terminated IP's relationship with the Unions and the employees. With the EBP being a settlement of 178 grievances, not a "collective bargaining agreement" to which PACE Constitution Article XVI, Section 1 would apply.

But what PACE I U meant by its wording of "collective bargaining agreement" in its constitution is what counts, not by others' understanding.  The meaning was supplied by Gerald Johnston, the EBP was not a CBA. (Johnston deposition. pp. 12-14). An interpretation that the EBP was a CBA would render of no effect PACE Constitution ARTICLE XVI, Section 3, empowering the Unions to

present, negotiate and settle any and all grievances, complaints and disputes with an employer.

6. <u>Another reason that the Unions breached no DFR</u>.

Although no voted was thus required, DFR standards further absolve the Unions. As held in <u>Vaca v. Sipes</u>, **supra**, where the union had misinterpreted Missouri law, this did not thereby breach its duty of fair representation, its interpretation not being arbitrary, discriminatory or bad faith conduct.  In <u>Ruzicka v. General Motors Corp.</u>, 707 F.2d 259, (6th Cir., 1983), the Sixth Circuit followed these limits and held that the union's negligent omission to file a timely grievance was excused, not being egregious. (<u>Ruzicka III</u>).  And in <u>Poole v. Budd Co.</u>, 706 F.2d 181, (6th Cir., 1983), the Sixth Circuit held:

> "Union representatives are not to be strictly held to the standards of attorneys.... Mere negligent understanding of a legal standard ... does not constitute the arbitrariness or reckless disregard required to establish a breach of the duty of fair representation."

If PACE IU Vice President Johnston misunderstood the PACE IU constitution, this and the other union actions complained of were not arbitrary, discriminatory or bad faith, and not actionable.

6. <u>The local union bylaws are not a § 301 contract</u>.

Plaintiffs claim that the Local Bylaws required a membership vote. (See Bylaws, 2d amended complaint, Exhibit D, and memo contra p. 14).  The Union has interpreted its Bylaws referring to agreement as meaning collective bargaining agreements.  The PACE IU Constitution provides in Article VII, Sec. 5:

"In the event of a conflict between bylaws of a Local Union and this Constitution, the Constitution shall be controlling." (Pltfs' Complaint, Exhibit E, page 23).

The interpretation that the local bylaws required a membership vote on the EBP would be contrary to the PACE IU Constitution, ARTICLE XVI, Section 3, and void under ARTICLE VII, Section 5. A finding that a vote was required on the EBP as a CBA, would nullify PACE IU Constitution, ARTICLE XVI, Section 3, providing Union authority to settle grievances without a vote, here 178 grievances settled. They need not have been severance pay grievances, but they were the main feature of the EBP. None of this was stated in Plaintiffs' second amended complaint, thus no motion to dismiss on this. Now this is a reason to dismiss Plaintiffs' No vote claim.

This Court decided <u>Argentine v. Steelworkers</u>, 23 F. Supp. 2d 808, (SD Ohio 1998), holding that a federal court lacks §301 jurisdiction to find breach of a local union's bylaws not being a contract **between** labor organizations. <u>Argentine</u> cited as a contrast <u>Wooddell v. IBEW Local 71</u>, 502 US 93 (1991), holding that an international constitution was a contract between labor organizations, and <u>Korzen v. Local Union 705</u>, 75 F.3d 285 (7th Cir. 1996) (local bylaws not a §301 contract). Plaintiffs cite <u>Tisdale v. Local 704</u>, 25 F.3d 1308 (6th Cir. 1994), but <u>Tisdale</u> was a removal case. The Sixth Circuit ordering remanded to state court because Tisdale's state law claim for race discrimination did not depend on interpretation of a CBA.

The EBP was prepared by IP, not the Unions, which interpreted

the EBP reference to union ratification to mean union agreement, not a membership vote. (Bray 12/17/04 depo. p. 17). Ambiguity favors he who did not draft. He who speaks must speak plainly. Tom Stewart, IP's negotiator of the EBP, agreed, testifying that "ratification" in the EBP meant that the Unions would tell IP that the EBP had been approved. (Stewart depo. p. 26). When asked by Plaintiffs' counsel if this meant the Unions would get membership approval on the EBP, Stewart answered: "No necessarily, it meant they would give me a signature on the page." (Stewart depo. p. 26). This is conclusive that the EBP did not specify a membership vote. IP received the Unions' signatures and implemented the EBP.

    5. Plaintiffs' failure to exhaust remedies. The third reason Plaintiffs have no claim under Policy #817, is that they did not file grievances to claim such severance pay and thus did not exhaust their contract remedies. Plaintiffs opposed our defense of failure to exhaust remedies by citing the wrong exhaustion issue. They referred to internal union appeal procedures. (Memo. contra p. 17). But our main brief in support of our motion for summary judgment referred only to Plaintiffs' failure to invoke the grievance and arbitration procedure of the CBA ¶8.01 et seq. of the 1990 CBA, carried forward in the 1993 and 1996 CBA's.

    It is this failure to exhaust remedies under the CBA and Policy #817 that bars any severance pay claims under the 1996 CBA in any event. Plaintiffs failed to comment on this. See Kaiser v.

12

U S Postal Service, 908 F.2d 47, (6th Cir. 1990); and Ryan v. General Motors Corp., 888 F.2d 1392, (6th Cir. 1989).

How would any such timely grievances have been viewed by the Unions?  Severance pay for all employees would have fit with the Unions' proposal in negotiating the EBP, that all employees receive severance pay.  Plaintiffs' failure to file any grievance deprived the Unions of taking a good look at their claims and seeing some possibilities of success.  Plaintiffs' failure to file grievances deprived the Unions from considering the merits of their claims. The Unions were sued instead.

6. **Plaintiffs' claim for wages under the 1996 contract.**

Plaintiffs have claimed that they are entitled to all wages and benefits under the 1996 contract up to the date of its expiration 9/21/2001. (Memo. contra, p. 20).  But none of them worked for IP after February 9, 2001, and thus none were thereafter entitled to anything under the 1996 contract. They were all "laid off" as of that date.  With the rare exceptions of cases like in Heheman v. E.W. Scripps and Detroit Typographical Union v. Detroit Newspaper Agy., **supra**, both with job security contracts guaranteeing printers life time jobs, no court has ruled that laid off employees continue to be entitled to wages and benefits. Note that the EBP ran 18 months to 8/9/2002.

7. **Plaintiffs' WARN Act claims.**  Plaintiffs claim the Unions breached their DFR by negotiating away their WARN Act claims in the EBP. (Memo. contra pp. 19-20).  This perhaps the most preposterous

claim they have made.   The EBP says nothing about the WARN Act.
Note that WARN was not even on the Unions' ask list. (See Bray
12/17/04 depo. Ex. 6). Plaintiffs have cited no legal authority for
this claim, and they did not even allege "WARN Act" in their second
amended complaint.

## CONCLUSION

IP had the right to terminate the 1996 agreement's provisions
for severance pay, per Policy #817, Section 9 which also was no
longer was effective because layoffs from mill reconfiguration
ended in early 1997.  IP did however need the Union's agreement to
settle all 178 outstanding grievance which it secured after two
weeks of meetings to settle.  There was no IP breach of contract or
of union DFR, both required.   No membership vote was required on
the EBP, but if it were found to be required, the Unions' "no vote"
action was not arbitrary, capricious or in bad faith, hence no DFR
breach.   The EBP secured severance pay for hundreds of IP
employees not hired by Smart. Plaintiffs were not entitled to a
vote on the EBP, but if it is established they were, the Unions did
not breach their DFR by Johnston's interpretation of the PACE
constitution.   For the reasons stated, PACE Local 5-1967 is
entitled to summary judgment against Plaintiffs.

/s/Robert I. Doggett
Robert I. Doggett (0016849)
Trial Attorney for Defendant
PACE Local 5-1967
6740 Clough Pike, Room 200
Cincinnati, Ohio   45244

Tel: 513/241-6116

CERTIFICATE OF SERVICE

The undersigned certifies that he served copies of the above document by the Clerk's CM/ECF system upon Mark J. Byrne, attorney for Plaintiffs, 2300 Kroger Building, 1014 Vine Street, Cincinnati, Ohio 45202, upon Grant S. Cowan, Frost Brown Todd, LLC, 2200 PNC Tower, 201 East Fifth Street Cincinnati, Ohio 45202-4182, upon Vincent J. Miraglia, Esq. International Paper Company Legal Department, 6400 Poplar Avenue, Memphis, TN 38197; upon James B. Robinson, attorney for PACE International Union, 2520 Kroger Building, 1014 Vine Street, Cincinnati, Ohio 45202; upon Charles E. Groppe, Morgan, Lewis & Bockius, LLP, 1111 Pennsylvania Avenue, NW, Washington, D.C. 20004, and upon Robert J. Hollingsworth, Cors & Bassett, LCC, 537 East Pete Rose Way, Suite 400, Cincinnati, Ohio 45202, attorneys for defendant Smart Papers, LLC.

/Robert_I._Doggett_____
Robert I. Doggett (0016849)
Trial Attorney for PACE Local 5-1967

reply#2