**APPENDIX A**

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2               SOUTHERN DISTRICT OF OHIO
 3                    WESTERN DIVISION
 4
 5    ------------------------------------
                                         :
 6   DORMAN ANGEL, et al.,               :
                                         :
 7          Plaintiffs,                  :
                                         :
 8       vs.                             :    CASE NO.
                                         :    C-1-01-467
 9   UNITED PAPERWORKERS                 :
        INTERNATIONAL UNION (PACE)       :
10      LOCAL 1967, et al.,              :
                                         :
11          Defendants.                  :
                                         :
12    ------------------------------------
13
14         Deposition of:  KENNETH C. STANIFER
15         Taken:          By the Plaintiffs
                           Pursuant to Notice
16
           Date:           November 22nd, 2004
17
           Time:           Commencing at 10:00 a.m.
18
           Place:          Kircher, Robinson,
19                           & Welch
                           2300 Kroger Building
20                         Suite 2520
                           Cincinnati, Ohio  45202
21
           Before:         Jennifer Coats
22                         Notary Public - State of Ohio
23
24                    COPY
25
```

**Ace Reporting Services  (513) 241-3200**
**30 Garfield Place, Suite 620   Cincinnati, Ohio  45202**

Page 58

1    A.  The employer and the union, we verified
2  that those were existing grievances.
3    Q.  So these were grievances.  There was a
4  list somebody prepared with regard to the existing
5  grievances and those were resolved on the 23rd and
6  24th?
7    A.  That's correct.
8    Q.  And you say the arbitrations were resolved
9  on that same day?
10    A.  Yes.
11    Q.  How were those resolved?
12    A.  By sitting down and bargaining with the
13  employer to reach a resolution that we could live
14  with.
15    Q.  It didn't go to arbitration on the 23rd or
16  24th?
17    A.  Lord no, I wish it was that simple.
18    Q.  So was there a list of individuals who had
19  reached the arbitration stage under the collective
20  bargaining agreement?
21    A.  As -- the best of my recollection, yes.
22    Q.  And there are documents that exist which
23  would identify how the grievances were resolved?
24    A.  Yes.
25    Q.  And there were documents that would exist

Page 59

1  that would identify how the arbitrations were
2  resolved?
3    A.  Yes.
4    Q.  Were the individuals who had filed the
5  grievances consulted before the grievances were
6  resolved?
7    A.  Once the grievances were reduced to
8  writing it becomes the property of the local union to
9  dispose of.
10    Q.  So the answer is no?
11    A.  Yes.
12    Q.  So in other words, would it be correct to
13  say --
14    A.  We didn't ask their permission because
15  they were our property to dispose of as we see fit so
16  long as we do it in an unbiased way.
17    Q.  So I would be correct in stating that none
18  of the individuals who had filed the grievances --
19    A.  Some --
20    Q.  You have to let me finish -- were
21  consulted prior to the union resolving those
22  grievances on the 23rd and 24th?
23    A.  Timmy may have talked to some after
24  resolution.  But prior to resolution, no, it was our
25  problem to resolve those issues.

Page 60

1    Q.  Similarly with the arbitration -- strike
2  that. Similarly with the request for arbitration or
3  the grievances that had reached the arbitration
4  stage, would I be correct to state that the
5  individuals who had filed the grievances and had
6  reached the arbitration stage weren't consulted
7  before the arbitration was resolved?
8    A.  That's correct.
9    Q.  Anything else that occurred, then, on the
10  23rd or 24th?
11    A.  On the 24th we had an executive board
12  meeting with the entire executive board to explain
13  the terms and conditions of the effects bargaining
14  package.
15    Q.  To the executive committee?
16    A.  To the executive committee.
17    Q.  How many members would the executive
18  board --
19    A.  11 members.
20    Q.  Did they all attend?
21    A.  Yes.
22    Q.  Were there minutes of that committee
23  meeting?
24    A.  I don't know.
25    Q.  Did you see any?

Page 61

1    A.  No.
2    Q.  What happened during that executive
3  committee meeting?
4    A.  We explained the offer proffered by IP.
5    Q.  Was this document, which has been
6  identified as Exhibit 4, in finished form so the
7  executive committee could actually read it?
8    A.  Not at this point in time.  The resolution
9  grievances -- yes, it was.  I'm sorry, I remiss; the
10  resolution agreements was on there.
11    Q.  So what you're telling me is that there
12  was a meeting on the 24th with the executive
13  committee?
14    A.  That's correct, in the afternoon.
15    Q.  And at that point in time, this written
16  document that's been identified as Exhibit 4 was
17  presented to the executive committee by yourself and
18  Mr. Bray?
19    A.  That's correct.
20    Q.  And what occurred then?
21    A.  We explained it to them and the question
22  was posed, do we have to vote on this.
23    Q.  Who posed that question?
24    A.  I don't recall who posed it.
25    Q.  And --

16 (Pages 58 to 61)

Page 62

1  A. But the response was, we don't want to
2  vote on it.
3  Q. Someone on the executive committee posed
4  the question?
5  A. Yes.
6  Q. And was that question posed to you or
7  Mr. Bray?
8  A. It was posed to me.
9  Q. And someone on the executive committee --
10 who's an executive committee of the local -- posed
11 the question to you, who was the international rep at
12 the time, do we have to vote on this?
13 A. Correct.
14 Q. And how did you respond?
15 A. I told him I didn't believe we did but I
16 would consult Gerald Johnston. The basis for that
17 belief is that it was not an amended collective
18 bargaining agreement, it was a severance package.
19 Q. So when you gave the response to the local
20 individual, do we need to vote, you told them you
21 didn't think that the local needed to vote?
22 A. But I would verify it.
23 Q. But you would verify it with Mr. Johnston?
24 A. That's correct.
25 Q. But the basis upon which you came to the

Page 63

1  conclusion that you didn't believe that a vote was
2  needed was because this was a severance package and
3  not a part of the bargaining agreement?
4  A. That's correct.
5  Q. Did you go ahead and consult counsel with
6  regard to your opinion?
7  A. No, I did not.
8  Q. Did you --
9  A. Years of experience taught me that.
10 Q. I understand. But with regard to -- not
11 withstanding the years of experience you had, that
12 conclusion you came to with regard to the
13 significance of Exhibit 4, did you consult counsel at
14 any time?
15 A. Only after we got sued.
16 Q. Well, I understand that, but before?
17 A. No, I did not.
18 Q. And I think I knew the answer to this, you
19 haven't gone to law school, have you?
20 A. No.
21 Q. Have any legal training?
22 A. Well, I took a little bit when I went to
23 American Institute of Banking.
24 Q. A little --
25 A. Commercial paper, law contracts.

Page 64

1  Q. How about the law of collective
2  bargaining?
3  A. I went to George Minian Institute.
4  Q. What is that?
5  A. It's a learning center in Silver Springs,
6  Maryland. Not specifically for bargaining but for
7  arbitration and some other things, even though I was
8  experienced at it.
9  Q. Any materials that you can point to me
10 that you've reviewed or you were exposed to in any of
11 these seminars that would confirm or corroborate the
12 opinion that you had in January that this was not a
13 collective bargaining agreement -- Exhibit 4?
14 A. No, I can't. But it's very simple in my
15 mind, that it did -- it was not an amendment to an
16 existing collective bargaining agreement, it didn't
17 require a vote. But I wanted it verified, that's why
18 I called my boss.
19 Q. And that's Mr. Johnston?
20 A. That's correct.
21 Q. And when did you call him?
22 A. Same day, 24th.
23 Q. You knew, though, that the local would be
24 looking to you for guidance with respect to how to
25 proceed in this particular case?

Page 65

1  A. Absolutely. But I wanted to make certain
2  that I was on solid ground.
3  Q. Okay.
4  A. And that's why I called Gerald.
5  Q. And you called Gerald on the phone?
6  A. Right.
7  Q. And when you called him, what did he say?
8  A. He told me that, no, we didn't have to
9  have a vote. But if we did have a vote and it was
10 voted down, I was to sign the agreement anyway.
11 Q. And did you ask him why?
12 A. Yes. It was a very simple answer, is that
13 had it been voted down, 100-plus people would have
14 received nothing except for what they were entitled
15 to under the labor agreement which was one month
16 health care and any accrued vacation. They would
17 have been out on the street without anything.
18 Q. We'll get to that in a minute. But just
19 so the record's clear, on that day, the 24th, you
20 called Mr. Johnston, correct?
21 A. Correct.
22 Q. At that point in time he held a position
23 of authority with the union?
24 A. I did.
25 Q. Both of you did?

17 (Pages 62 to 65)

**APPENDIX B**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

------------------------------------
                                    :
                                    :
DORMAN ANGEL, et al.,               :
                                    :
         Plaintiffs,                :
                                    :
                                    :         CASE NO.
    vs.                             :         C-1-01-467
                                    :
UNITED PAPERWORKERS                 :
    INTERNATIONAL UNION (PACE)      :
    LOCAL 1967, et al.,             :
                                    :
         Defendants.                :
                                    :
------------------------------------

            Deposition of:  KENNETH C. STANIFER
            Taken:          By the Plaintiffs
                            Pursuant to Notice

            Date:           November 22nd, 2004

            Time:           Commencing at 10:00 a.m.

            Place:          Kircher, Robinson,
                              & Welch
                            2300 Kroger Building
                            Suite 2520
                            Cincinnati, Ohio  45202

            Before:         Jennifer Coats
                            Notary Public - State of Ohio

COPY

Page 90

1  A.  Yes.
2  Q.  What was the procedure as to how this
3 provision was included in the effects bargaining
4 agreement?
5      MR. DOGGETT:  Which provision?
6      MR. BYRNE:  Severance.
7  A.  Severance, the pay?
8  Q.  Right, how did you come up with that?
9  A.  We requested severance for all people, we
10 did not receive it, the company did not counter it.
11 They countered with 40 hours paid for each year of
12 service, I countered with 60 hours pay, which was
13 arrived at on the basis that this is what IP had
14 given other plants that they closed down.
15  Q.  Okay.
16  A.  And I told them it wasn't fair not to pay
17 these people at least the same as they paid the other
18 ones they closed the plants down or sold their
19 plants, or whatever may be.  In the severance, they
20 also — they were attempting to exclude those that
21 tested positive on a drug test.
22      My question I posed Mr. Stewart, how many
23 lawsuits do you want?  I said, never has there been a
24 perquisite and a severance package that one must pass
25 a drug test in order to be entitled to severance pay.

Page 91

1 And we had some people unfortunately who failed that
2 test who received the severance pay.
3  Q.  Let's talk about your initial offer on
4 severance to the company, was that?
5  A.  My first offer, as I recollect, was two
6 percent of the W2 in the best year and that's — you
7 know, the best of my recollection.
8  Q.  Your first offer was that each employee at
9 the time of the plant closing be paid two percent of
10 their W2?
11  A.  Their best.
12  Q.  Their best W2?
13  A.  And again, I'm working from memory.
14  Q.  I understand.
15  A.  Not notes.  Because quite frankly, I don't
16 take a whole lot of notes.
17  Q.  I understand.  This is the only time I get
18 a chance to ask you about this.
19  A.  I understand.
20  Q.  So that was for all employees, not just
21 employees that would be hired?
22  A.  It's for everybody.
23  Q.  And their response was?
24  A.  No, those people are getting jobs.  Those
25 that get jobs are not entitled to severance from the

Page 92

1 perspective of IP.
2  Q.  And what was your response?
3  A.  I again reiterated that I thought they
4 were severing their ties with IP and they were
5 entitled to it.  Subsequently, this is what we
6 arrived at.
7  Q.  So at some point in time, you gave up the
8 claims of individuals that were going to be hired by
9 Smart —
10  A.  Yes.
11  Q.  You have to let me finish.  At some point
12 in time during negotiations, you agreed to give up
13 the claims for severance of the individuals who would
14 be hired by Smart?
15  A.  See, I've dealt with International Paper
16 for approximately 20 years.  I know when they tell me
17 that's it — I'm not totally ignorant of the process
18 of bargaining.  And I know when that matter went
19 across the table, that this was it.
20  Q.  Still my question is a little bit
21 different.  You knew at the time when you were
22 negotiating this effects bargaining, Exhibit 4, that
23 by agreeing that people who were hired by Smart would
24 not give up severance, that you were giving up those
25 claims on behalf of those individuals?

Page 93

1      MR. ROBINSON:  Objection, go ahead.
2  A.  I knew that if we didn't accept the terms,
3 that there would be a lot of people who wouldn't
4 receive anything but other than what the contract
5 provided for.
6  Q.  But for some of these people that were
7 members of the union, you agreed that they would not
8 receive severance?
9  A.  I didn't agree.  This is what was put out
10 to me as their best, last and final.
11  Q.  At some point in time, you talked about
12 the fact you signed Exhibit 4?
13  A.  That's correct.
14  Q.  And when you signed Exhibit 4, it became a
15 document that was enforceable, correct?
16  A.  That's correct.
17  Q.  And so when you signed it, you knew that
18 there were certain people that were not going to get
19 severance?
20  A.  That's correct, I did.
21  Q.  And those people were members of the union
22 that you represented?
23  A.  That's correct.  I also knew that I would
24 be in bargaining, once the majority got in there, to
25 help those people that remained.

24 (Pages 90 to 93)

**APPENDIX C**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

------------------------------------
DORMAN ANGEL, et al.,                :
                                     :
         Plaintiffs,                 :
                                     :
    vs.                              :    CIVIL ACTION
                                     :    NO.C-1-01-467
UNITED PAPERWORKERS INTERNATIONAL    :
UNION (PACE) LOCAL 1967, et al.,     :
                                     :
         Defendants.                 :
                                     :
------------------------------------

        Deposition of: TIMOTHY D. BRAY

        Taken:        By the Plaintiffs
                      Pursuant to Notice

        Date:         November 29, 2004

        Time:         Commencing at 10:26 a.m.

        Place:        Kircher, Robinson & Welch
                      Suite 2520
                      1014 Vine Street
                      Cincinnati, Ohio  45202

        Before:       David W. Moxley, RPR, CRR, CMRS
                      Notary Public - State of Ohio

COPY

**Ace Reporting Services  (513) 241-3200**
**30 Garfield Place, Suite 620   Cincinnati, Ohio  45202**

55

1    and international unions?

2         A.    He did tell me that, but to be honest, I'm

3    not sure of the time frame.

4         Q.    Well, if Mr. Stanifer testified he talked

5    to Mr. Cohen on January 9th, would your discussion

6    with Mr. Stanifer have been right around that time?

7         A.    Yes.

8         Q.    And tell me, so when you met on the 22nd,

9    who did you meet with?

10        A.    We met with -- his name was Tom Stewart.

11   He was, I suppose, some sort of a human resource

12   person from International Paper headquarters.  We met

13   with Anetta Johnson, who was the human resource

14   manager there at the B Street facility, and Milton

15   Lewis, who was the employee relations supervisor

16   there at the B Street facility.

17        Q.    And did you come to the effects bargaining

18   meeting with a list of issues that you wanted to go

19   ahead and resolve?

20        A.    Yes, I did.

21        Q.    Do you still have that document available?

22        A.    No, I don't have it.

23        Q.    Was that written down?

24        A.    I believe it is, yes.

25        Q.    And who was there on behalf of the union?

96

1    A.    Yes.

2    Q.    And did anybody at any time come to you

3 after that time and say that they were dissatisfied

4 with this?

5    A.    Yes.

6    Q.    Who?

7    A.    It was probably -- I don't know the

8 individuals name by name, because there was several

9 individuals.

10    Q.    Can you tell me what they said?

11    A.    Yeah.  They was wondering why everyone

12 didn't get it.  We said we tried to get it for

13 everyone, but this is the best we could get out of

14 them.

15        I mean, even before we went in, we knew

16 that everyone wanted severance.  I mean, to be quite

17 honest with you, I wanted severance.  Hell, I had 28

18 years there.  Sure.  But this was the best we could

19 come up with.

20    Q.    Well, at the time that you agreed to this,

21 no one knew who was going to get severance, is that

22 fair?

23    A.    That's correct.

24    Q.    You didn't know if anybody was going to

25 get severance, right?

1    Q.   Okay.  So on that basis, is that why you

2    asked for everybody should receive it?

3    A.   Well, yes.  On that basis, yes.

4    Q.   Including Tim Bray?

5    A.   Yes.  I believe I spoke earlier.  I had 28

6    years at the facility, so yes.  I mean, I'm not

7    wanting -- I'm not trying to be greedy or nothing,

8    but I think it should have been given to everyone,

9    myself included.

10    Q.   And that's what you proposed?

11    A.   Yes.

12    Q.   What was their response to that?

13    A.   That they were not going to do that.  We

14    had told them that you gave the severance to those

15    from IP at Springdale.  And they said that was a

16    plant closure, that no one purchased the facility and

17    kept it open and running.  This was different in that

18    aspect, if they would give it to those who was not

19    offered a job or failed a drug screen.

20    Q.   Did they have a primary spokesman on the

21    IP side?

22    A.   Yes.

23    Q.   Who was that?

24    A.   Tom Stewart.

25    Q.   Okay.  So, typically, you had one

1    spokesman for each side?

2        A.    Yes.

3        Q.    Now -- so who was going to get severance

4    pay, as IP had told you?

5        A.    As they had proposed to us?

6        Q.    Yes.

7        A.    As they said it was going to happen?  That

8    anyone who was not offered employment, for whatever

9    reason SMART had for not offering employment, whether

10   it be because they wasn't going to hire the person or

11   because they showed positive on the drug test, those

12   folks would receive the severance.

13       Q.    Was it necessary, for people to receive

14   the severance, to go entirely through the process of

15   application and interview and drug testing?

16       A.    Yes, it was.

17       Q.    Did you have one fellow tell you he wasn't

18   going to go through all that because he would get

19   busted on the drugs?

20            MR. BYRNE:   Objection.

21            MR. DOGGETT:   You may answer the question.

22       A.    Yes.

23   BY MR. DOGGETT:

24       Q.    Who was it?

25            MR. BYRNE:   Objection.

1  hey, wait a minute.  In other facilities he knew of,
2  he said you had given 60 times the hourly rate times
3  the years of service, and that you gave that to
4  everyone.
5          Well, the company paused, you know, they
6  took a break kind of thing, they came back and they
7  said, we'll give you the 60 times the hourly rate
8  times the years of service, but everyone is not going
9  to get it.  The only reason they got it there at
10  Springdale was because they had closed and they were
11  not opening back up and there was not going to be
12  another place for those folks to work right there.
13  They was going to have to go somewhere else.
14          Q.    Who made that statement?
15          A.    Tom Stewart.
16          Q.    So that the record is clear, Tom Stewart
17  said to you that the folks at Springdale, all the
18  employees who were members of the union, received
19  that severance, because Springdale had closed up and
20  there wasn't going to be a place for the folks in
21  Springdale to continue working?
22          A.    Yes.
23          Q.    And in this particular case, there was
24  going to be a place at B Street where some of the
25  folks could continue working?

**APPENDIX D**

Page 1

1                UNITED STATES DISTRICT COURT
2                 SOUTHERN DISTRICT OF OHIO
3                     WESTERN DIVISION
4

    ------------------------------------
5                                        :
   DORMAN ANGEL, et al.,                 :
6                                        :
              Plaintiffs,                :
7                                        :
        vs.                              :        CASE NO.
8                                        :        C-1-01-467
   UNITED PAPERWORKERS                   :
9      INTERNATIONAL UNION (PACE)        :
       LOCAL 1967, et al.                :
10                                       :
              Defendants.                :
11                                       :
    ------------------------------------
12
13
14        Deposition of:  TOM STEWART
                          (via telephone)
15
          Taken:         By the Plaintiffs
16                        Pursuant to Notice
17        Date:          January 27th, 2005
18        Time:          Commencing at 4:31 p.m.
19        Place:         Jacobs, Kleinman, Seibel
                          & McNally Co., L.P.A.
20                        2300 Kroger Building
                          1014 Vine Street
21                        Cincinnati, Ohio  45202
22        Before:        Jennifer Coats
                          Notary Public - State of Ohio
23
24
25                                        COPY

Page 38

1 Paper typically would negotiate effects packages.
2    Q.  So did you actually read this asset
3 purchase agreement before you went in with the
4 effects bargaining?
5       MR. MIRALGIA:  Objection, asked and
6    answered.
7    Q.  I may have, I'm sorry if I did.
8    A.  I probably did but I don't remember
9 exactly.  The first time I really remember looking at
10 that was when the union asked for a copy of it and I
11 asked Ms. Margolese to fax me a copy of it.  But I'm
12 sure Mr. Baymiller and myself had discussed issues
13 inherent of selling and our preparation of effects'
14 parameters.
15    Q.  That would make sense.  Did you ever
16 provide a copy of the sale agreement to the union?
17    A.  I did.
18    Q.  Who did you give that to?
19    A.  I believe Mr. Stanifer or – and Mr. Bray.
20    Q.  So they both had copies of asset purchase
21 agreements between --
22    A.  Yes, they did, and the portion relative to
23 employee matters only.
24    Q.  Which would have started with -- and I'm
25 not sure; do you have that in front of you?

Page 39

1    A.  I do, it's on page 15 and runs through
2 several pages -- maybe 18 or so.
3    Q.  Where it says page 15, related matters?
4    A.  Right.
5    Q.  And goes all the way through, I think,
6 page 21, maybe?
7    A.  Yes.
8    Q.  Actually 22.  And I know you didn't --
9 then you had someone actually give you a set of
10 directions on how to negotiate the severance issue
11 with the union so that the liability to International
12 Paper would be reduced with respect to severance?
13       MR. MIRALGIA:  Objection,
14    mischaracterization of prior testimony -- Mr.
15    Miralgia here.
16       MR. ROBINSON:  Jim Robinson, objection.
17    Q.  Did you understand my question?
18    A.  I'm not sure I did.
19    Q.  Let me see if I can break it down.  We
20 know that you had a copy of a sale agreement prior to
21 the time you entered in the Effects Bargaining
22 Package with the union, correct?
23    A.  We'll assume that.
24    Q.  And then you're not a lawyer, I know that,
25 correct?

Page 40

1    A.  Correct.
2    Q.  So then you were given some type of
3 direction from somebody International -- other than
4 what was contained in the sales asset agreement as to
5 the manner in which to negotiate the Effects
6 Bargaining Package, correct?
7    A.  That is correct.
8    Q.  All right.  And have you seen that
9 document lately?
10    A.  Whatever I was given was incorporated in
11 the effects package.
12    Q.  Okay.  Was there any discussion with
13 anyone about the number of employees that IP was
14 going to provide to Smart?
15    A.  I don't believe IP was going to.
16    Q.  All right.
17    A.  I mean, you know, Mark, if you look at
18 this package, you know, on page 16.
19    Q.  Yes.
20    A.  About the forth or fifth line down it
21 says, the number of offers of employment made by the
22 buyer, prior conditions, such offers shall be
23 determined by the buyer -- full discretion, and so
24 forth.
25    Q.  I understand.  And all I'm trying to find

Page 41

1 out from you is how those provisions came about and I
2 think I'm getting an understanding now of how that
3 occurred.  And it may seem tedious but I appreciate
4 your patience.
5    A.  Okay.
6    Q.  It was your understanding that in order to
7 obtain a severance, though, the employee first, who
8 was at International Paper, had to apply to Smart for
9 a position of employment, correct?
10    A.  That was one of the items they had to
11 comply with.
12    Q.  And I believe the next step is that not
13 only did they have to apply but they had to be denied
14 or turned down in their application; is that right?
15    A.  They had to be not offered employment.
16    Q.  All right.  And then the sticking point
17 that you indicated was, if the nonoffer came back
18 because of a failed drug test, IP had some hesitancy
19 in agreeing to pay for the severance for that
20 individual when they were denied employment because
21 of that fact?
22    A.  That was our first offer.
23    Q.  And then during the period of negotiation,
24 IP eventually acquiesced into paying severance when
25 the denial of this application came through,

11 (Pages 38 to 41)

**Ace Reporting Services  (513) 241-3200**
**30 Garfield Place, Suite 620   Cincinnati, Ohio  45202**

Page 46

1    It was Anneta Johnston.
2        Q.  How about Mr. Phillips?
3        A.  That doesn't sound familiar.
4        Q.  All right.  Well --
5        A.  I'm sure that some of the people you
6    represent would know what I'm talking about.
7        Q.  I know that.  With regard to the settling
8    of the grievances.
9        A.  Yes, sir.
10       Q.  Were those grievance settled without
11   contacting the individuals who had filed them?
12       A.  I have no idea.
13       Q.  Did you have an understanding of whether
14   or not the grievances would be settled in that manner
15   without contacting the individuals that had filed
16   them?
17       A.  I did not.
18       Q.  Did the union represent one way or the
19   other that they would contact and dispose and resolve
20   the grievances after contacting the individuals who
21   had filed them?
22       A.  The union appointed two people and I
23   appointed Anneta Johnston and the gentlemen I've been
24   talking about to work together and come back to me --
25   and Mr. Stanifer -- with a proposal resolution of all

Page 47

1    of the outstanding grievances and that's what they
2    did.  And when they came back, I accepted it.
3        Q.  Okay.  So you don't know the method in
4    which they were resolved?
5        A.  I do not.
6        Q.  Did you have any discussion with Stanifer
7    as to what IP's position would be with regard to
8    severance if everyone was terminated and no one
9    applied to Smart?
10       A.  We didn't really discuss that, to my
11   knowledge, not in those terms.
12       Q.  The provision on the first page of this
13   Effects Bargaining Agreement regarding the
14   ratification, was that something that you insisted
15   upon or was that something that was put in there by
16   the union?
17       A.  That's something I insisted upon.
18       Q.  When there was discussion about the
19   severance for the employees, I think you indicated
20   that the company first requested severance for
21   everybody; is that right or no?
22           MR. MIRALGIA:  Vinny Miralgia, objecting
23   to the mischaracterization of prior testimony.
24       Q.  Let me go back.  When the discussion about
25   severance occurred, what was the union's -- what was

Page 48

1    the union's initial position?
2        A.  Mark, like I said, I don't recall
3    specifically what the union's request was regarding
4    severance.  I would assume that they were requesting
5    severance for everyone.
6        Q.  But you don't recall?
7        A.  But I don't know specifically what it was,
8    I would assume that that was the case, that would be
9    typically what the union would request in such a
10   situation.
11       Q.  What I'm trying to find out is, then, how
12   it evolved, from your recollection, to typically the
13   union requesting severance for everyone to the point
14   where the union was only -- agreed that the only
15   individuals who didn't get a job with Smart would be
16   entitled to severance?
17       A.  I'm sure that's what I said.  You know, I
18   just told them, we weren't going to -- you know, what
19   would we do with someone who quit, what would we do
20   with someone we terminated for cause, would you pay
21   severance to somebody who goes to work for Smart and
22   on and on.  And then, you know, we went back and
23   forth discussion on it until we came to what we came
24   to.
25       Q.  Okay.  Do you recall any discussion

Page 49

1    regarding the 18th month clause that's in here?
2        A.  Yes, they were concerned about people who
3    went to work for Smart and then Smart laid them off.
4    They were -- as I recall, they were concerned about
5    the possibility of certain processes of the plant
6    maybe not continuing.  They were concerned -- they
7    were concerned about Smart hiring people and then
8    subsequently laying them off in order to save a piece
9    of severance pay -- those kinds of things -- so
10   that's when we came back and put the 18 months in.
11       Q.  Okay.  Was there any discussion about the
12   WARN Act?
13       A.  There was and we had pretty much left
14   that -- that was being dealt with.  We would handle
15   all of the legal requirements associated with the
16   WARN Act and that and I believe Smart Paper would be
17   required to do the same.
18       Q.  Was there any discussion about the
19   employees being laid off, being entitled to WARN
20   benefits?
21           MR. MIRALGIA:  Objection, to the extent it
22   calls for a legal conclusion.
23       Q.  Go ahead, sir.
24       A.  It seems to me that there was some
25   discussion about it.  But off the top of my head,

13 (Pages 46 to 49)

Page 58

1   page 63 of the sale agreement, there is some -- there
2   is some verbiage regarding nonsolicitation of
3   employees. To whatever extent that might address
4   your question, I will refer you to that. That would
5   be paragraph 820.
6       Q.  820 is a provision that talks about
7   nonsolicitation of employees?
8       A.  That's correct.
9       Q.  And basically, is it your understanding
10  that the provision suggests that seller, which is IP,
11  will not solicit it's former employees who become
12  hired by Smart?
13      A.  We won't meddle with the employees to
14  influence them as to what their future employment
15  decision is.
16      Q.  In other words, you'll let Smart go about
17  their hiring process without meddling and then you
18  won't meddle with them and try to hire them away,
19  other than in your normal course of business, once
20  they're hired by Smart?
21      A.  That's kind of my understanding of it. I
22  think that's more boilerplate kind of language.
23      Q.  Right.
24      A.  But I didn't want you to overlook it.    .
25      Q.  Thank you. And after you received the

Page 59

1   Effects Bargaining Agreement back from the union
2   after it had been ratified -- at least as your
3   definition -- how, if at all, were you involved in
4   the sale process?
5       A.  None specific to the sale itself. My
6   involvement was working with Anneta Johnston and
7   others at the facility regarding implementation of
8   the provisions of the effect. There were, you know,
9   questions and the payment of those grievances of
10  settlement we had reached, severance payments, et
11  cetera, who was eligible, who wasn't.
12      Q.  Okay. And the asset purchase agreement
13  that you have in front of you?
14      A.  Yes, sir.
15      Q.  That is a document that numbers 72
16  pages with two subsequent pages, one signed by Mr.
17  Lytton and another signed by Mr. Leder?
18      A.  Yes, sir.
19      Q.  And this is a copy of the agreement. What
20  we'll do is mark this as Stewart Deposition Exhibit
21  2. And Stewart Deposition Exhibit 2 is a copy of the
22  agreement that you gave to the union at the time the
23  fixed negotiation process was undergone?
24      A.  No, sir. The only thing I gave to the
25  union was the employee matters section 4.1 starting

Page 60

1   on page 15.
2       Q.  I'm sorry, 4.1?
3       A.  Yes, sir.
4       Q.  Starting on page 15?
5       A.  Correct.
6       Q.  Going to what?
7       A.  Really all of that article, I believe.
8       Q.  To page 22?
9       A.  I believe it goes down to 4.2, yes.
10      Q.  And you provided this to Mr. Stanifer?
11      A.  And to Mr. Bray.
12      Q.  Okay. I think, sir, that's all I've got
13  at this point in time.
14          (Deposition Exhibit 2 was marked for
15          identification.).
16          MR. MIRALGIA:  Thank you, Mark. This
17  is -- if we are going to attach this, I'd like
18  to mark it confidential as per our agreement,
19  Mark.
20          MR. BYRNE:  It's marked confidential up
21  here and I think -- I would agree that that
22  would remain confidential. What we would do is
23  put it in an envelope, seal it and mark it as
24  confidential by the court reporter.
25          MR. MIRALGIA:  Thank you.

Page 61

1           MR. ROBINSON:  This is Jim Robinson, I
2   have a couple of questions.
3               EXAMINATION
4   BY MR. ROBINSON:
5           MR. ROBINSON:  And Vinny, has Mr. Stewart
6   been listed as a witness for trial?
7           MR. MIRALGIA:  Not to my knowledge, no.
8       Q.  Mr. Stewart, my name is Jim Robinson, I'm
9   a lawyer for PACE.
10      A.  Yes, sir.
11      Q.  And just a couple of questions. Did the
12  union have anything coming under the old contract
13  that they gave up in negotiations?
14      A.  Say that again, Jim?
15      Q.  Did the union have anything coming under
16  the old contract that they gave up in the
17  negotiations with you?
18          MR. MIRALGIA:  Objection to the extent
19  that "old contract" isn't identified -- not
20  sure to what you're referring to, Jim.
21      Q.  Okay. There was a contract between IP and
22  the union, right?
23      A.  Yes, sir.
24          MR. MIRALGIA:  The Collective Bargaining
25  Agreement is the initial one?

16 (Pages 58 to 61)

Page 62

1   MR. ROBINSON: Yes.
2   MR. MIRALGIA: Okay.
3   Q. Did the union give up anything they were
4   entitled to under that contract?
5   A. **Under the terms of the Effects Bargaining**
6   **Package?**
7   Q. Correct.
8   A. **No, sir. I think this were all additions**
9   **to the existing Collective Bargaining Agreement.**
10  Q. Why did you agree to pay severance pay to
11  some people?
12  A. **Well, it was a matter of company policy,**
13  **that this is something that we -- that we wanted to**
14  **do it -- was something that we typically had done in**
15  **other plant sales and closures. And we certainly**
16  **didn't want to treat these employees differently.**
17  Q. Do you have any employment relationship
18  with the company at this point?
19  A. **No, sir.**
20  Q. Do you know where Anneta Johnston is now?
21  A. **I do not. The last I heard -- and this is**
22  **like three-year-old information -- is that she was in**
23  **North Carolina, but I can't tell you, Jim.**
24  Q. Okay, thanks.
25              EXAMINATION

Page 63

1   BY MR. GROPPE:
2   Q. This is Charlie Groppe, I represent Smart
3   Papers in this case. I just have two or three
4   questions for you, if you don't mind.
5       Did anyone from Smart Papers participate
6   in your bargaining with PACE over the effects of the
7   closure of the mill?
8   A. **None whatsoever.**
9   Q. Did you talk to anyone from Smart Papers
10  about your effects bargaining negotiations with the
11  union?
12  A. **No, sir.**
13  Q. Did you talk to anyone from Smart Papers
14  before the sale was consummated on February 9th about
15  the union in general?
16  A. **No, sir.**
17  Q. That's all the questions I've got, thanks.
18  MR. BYRNE: I just have one question and
19  maybe it's more directed at Vinny. Even though
20  Mr. Stewart's not been listed as a witness, he
21  is an individual who has knowledge, at least
22  with regard to these 30B6 issues, as he's been
23  able to testify to, right?
24  MR. MIRALGIA: I guess so. And frankly,
25  I'm not sure he hasn't been listed at least as

Page 64

1   a person with knowledge in our initial -- I
2   just don't recall that from three years ago.
3   MR. BYRNE: I can't remember either,
4   Vinny. I think the point is, there's some
5   issues that International Paper was asked about
6   and he was appointed to represent International
7   Paper with respect to those issues.
8   MR. MIRALGIA: Clearly.
9   MR. BYRNE: Okay. That's all I have at
10  the moment, sir. Thank you.
11  THE WITNESS: Thank you.
12
13

_____

14          TOM STEWART
15
16            - - -
17  DEPOSITION CONCLUDED AT 5:59 P.M.
18            - - -
19
20
21
22
23
24
25

Page 65

1          C E R T I F I C A T E
2   STATE OF OHIO        :
                         :  SS
3   COUNTY OF CLERMONT    :
4       I, Jennifer Coats, the undersigned, a duly
5   qualified and commissioned notary public within and
6   for the State of Ohio, do hereby certify that before
7   the giving of his aforesaid deposition, TOM STEWART
8   was by me first duly sworn to depose the truth, the
9   whole truth and nothing but the truth; that the
10  foregoing is the deposition given at said time and
11  place by TOM STEWART; that said deposition was taken
12  in all respects pursuant to stipulations of counsel;
13  that I am neither a relative of nor employee of any
14  of the parties or their counsel, and have no interest
15  whatever in the result of the action; that I am not,
16  nor is the court reporting firm with which I am
17  affiliated, under a contract as defined in Civil Rule
18  28(D).
19      IN WITNESS WHEREOF, I hereunto set my hand and
20  official seal of office at Batavia, Ohio, this ____
21  day of _____, 2005.
22
23  _____
    My commission expires:  Jennifer Coats
24  February 3rd, 2009.    Notary Public - State of Ohio
25

17 (Pages 62 to 65)

**APPENDIX E**

Page 1



1                    UNITED STATES DISTRICT COURT
2                    SOUTHERN DISTRICT OF OHIO
3                         WESTERN DIVISION
4
5       -----------------------------------
                                            :
6       DORMAN ANGEL, et al.,               :
                                            :
7             Plaintiffs,                   :
                                            :
8           vs.                             :      CASE NO.
                                            :      C-1-01-467
9       UNITED PAPERWORKERS                 :
        INTERNATIONAL UNION (PACE)          :
10      LOCAL 1967 1967, et al.,            :
                                            :
11            Defendants.                   :
                                            :
12      -----------------------------------
13
14            Deposition of:  JAMES BOGGS
15            Taken:          By the Defendants
                              Pursuant to Notice
16
              Date:           November 15th, 2004
17
              Time:           Commencing at 9:43 a.m.
18
              Place:          Jacobs, Kleinman,
19                               Seibel & McNally Co., L.P.A.
                              2300 Kroger Building
20                            1014 Street
                              Cincinnati, Ohio  45202
21
              Before:         Jennifer Coats
22                            Notary Public - State of Ohio
23
24
25                                            COPY

**Ace Reporting Services  (513) 241-3200**
**30 Garfield Place, Suite 620   Cincinnati, Ohio  45202**

Page 22

1  sue them for?
2      A.  Well, they was -- the way I look at it,
3  they was International Paper and Smart Paper worked
4  hand in hand on the deal that they worked out on that
5  severance thing -- and worked for.
6      Q.  You think the international union
7  discriminated against you?
8      A.  Yeah, for excepting it, without giving me
9  a chance to vote on it.
10     Q.  Did they let other people vote on it?
11     A.  No.
12     Q.  Do you have a theory on what you would
13 have gotten if you had voted on it?
14     A.  What I would have done?
15     Q.  What you would have gotten?
16     A.  I would have got the 47,000 that was on my
17 severance thing, I would imagine, if I would have
18 voted on it.
19     Q.  Was there ever anything proposing 47,000
20 for you to be voted on?
21     A.  It was in the severance package, yeah.
22     Q.  But part of the package was that if you
23 didn't get a job with Smart Paper, right?
24     A.  Yeah.
25     Q.  Was there ever a package just offering you

Page 23

1  severance pay without having to do anything with
2  Smart Paper?
3      A.  No.
4      Q.  Was there ever any proposal you could have
5  voted for that would -- that you think would have
6  helped you?
7      A.  Well, they could have come up with
8  benefits -- medical benefits for -- a lot of people
9  lost a lot of medical benefits on that deal.
10     Q.  Who could have come up with medical
11 benefits?
12     A.  Well, the people that didn't get hired
13 back and the people that even come back because they
14 still had that much time in for Champion and
15 International Paper.  A lot of people lost a lot of
16 money on that deal -- medical benefits.
17     Q.  I'm asking you, who could have come up
18 with medical benefits for those people?
19     A.  Well, the union.  They had negotiated, I
20 would imagine.
21     Q.  What makes you think the union could have
22 reached that result in negotiations?
23     A.  Well, don't they always reach agreements
24 sooner or later?
25     Q.  Well, they don't always reach agreements

Page 24

1  you vote for, right?
2      A.  That's true.  Just like everything,
3  majority rules.
4      Q.  I think I covered this, you haven't been
5  party to any other lawsuit aside from this one?
6      A.  I'm a party to a lawsuit on asbestos but
7  that ain't got nothing to do with this.
8      Q.  Does that involve Champion?
9      A.  Well, sure, it's where I got it.
10     Q.  Who else are you suing in that case?
11     A.  Pardon?
12     Q.  Who else are you suing in that case?
13     A.  Asbestos?
14     Q.  Yes.
15     A.  You have to talk to the lawyers about
16 that.  They suing everybody that made it, I guess.
17     Q.  Aside from the asbestos case, you've never
18 been party to any other lawsuit?
19     A.  No.
20     Q.  Asbestos and this one, you've never been
21 party to another lawsuit?
22     A.  Yeah, that's it.
23             CROSS-EXAMINATION
24 BY MR. DOGGETT:
25     Q.  You heard the deposition testimony of Gary

Page 25

1  Hensley, did you not, Mr. Boggs?  You were here?
2      A.  Yeah.
3      Q.  He said, we don't legally have to be given
4  any severance pay -- not talking about the agreement
5  but just legally, is that what you understood?
6          MR. SEIBEL:  Objection, go ahead and
7      answer.
8      Q.  There was no severance pay?
9      A.  What do you mean "legally"?
10     Q.  I mean there was no severance pay
11 agreement except this one; isn't that true?
12         MR. SEIBEL:  Objection, go ahead and
13     answer.
14     Q.  You should know if there was any severance
15 pay agreement so we could know about it.
16     A.  No, this is the only one that I know
17 about.
18     Q.  "This" being the one that was explained to
19 you in the meeting at the time that Pete turned it
20 over to Smart; that's what you're talking about?
21 This agreement's the only one I know about, meaning
22 that the one Ken Stanifer explained to you, right --
23     A.  Yeah.
24     Q.  -- where you had to get a job, had to
25 apply for a job with Smart and then you'd get

7 (Pages 22 to 25)

**APPENDIX F**

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF OHIO
 3                    WESTERN DIVISION
 4
 5    ----------------------------------
                                        :
 6    DORMAN ANGEL, et al.,             :
                                        :
 7          Plaintiffs,                 :
                                        :
 8       vs.                            :      CASE NO.
                                        :      C-1-01-467
 9    UNITED PAPERWORKERS               :
      INTERNATIONAL UNION (PACE)        :
10    LOCAL 1967 1967, et al.,          :
                                        :
11          Defendants.                 :
                                        :
12    ----------------------------------
13
14         Deposition of:  NORMAN BROWN
15         Taken:          By the Defendants
                           Pursuant to Notice
16
           Date:           November 15th, 2004
17
           Time:           Commencing at 11:35 a.m.
18
           Place:          Jacobs, Kleinman,
19                            Seibel & McNally Co., L.P.A.
                           2300 Kroger Building
20                         1014 Street
                           Cincinnati, Ohio  45202
21
           Before:         Jennifer Coats
22                         Notary Public - State of Ohio
23
24                                   COPY
25
```

**Ace Reporting Services  (513) 241-3200**
**30 Garfield Place, Suite 620   Cincinnati, Ohio  45202**

Page 6

1  air conditioning technician.
2      Q.  And have you been doing any work in that
3  field since then?
4      A.  I have investment property and I do the
5  work on my own property.
6      Q.  Are these residential rental units?
7      A.  Yes, residential rental.
8      Q.  And do you own these units in your own
9  name or in a corporate name?
10     A.  In my own name, mine and my wife.
11     Q.  How many units do you have?
12     A.  12.
13     Q.  And that keeps you occupied full-time?
14     A.  It varies.  Sometimes it does, sometimes
15  months go by and nothing has to be done.  It's
16  considered, I guess, passive income.
17     Q.  Did you apply for work with Smart Paper in
18  2001?
19     A.  No, I did not.
20     Q.  Why not?
21     A.  I didn't want to work there.
22     Q.  Because?
23     A.  I worked there 27 years and the working
24  conditions were terrible and I saw that it was not
25  going to get any better with Smart Papers.

Page 7

1      Q.  When did you apply for unemployment?
2      A.  Shortly after the February 10th date,
3  whatever -- 9th day, whatever it was.  They had a
4  meeting at the unemployment office and there was
5  quite a few people there and we applied at that
6  meeting.
7      Q.  Did unemployment ask you whether you had
8  refused work or not?
9      A.  I don't recall, I had never refused work.
10     Q.  Do you recall if they asked you whether
11  you had applied for work?
12     A.  I don't recall.
13     Q.  Did you go to a union meeting in January
14  of '01?
15     A.  Yes.
16     Q.  Where was the meeting?
17     A.  It was out on Milliken Road.  I believe
18  the name was -- I'm not sure what the name of it was.
19  It was a union hall -- it was somebody else's union
20  hall.
21     Q.  Who was conducting the meeting?
22     A.  Ken Stanifer and Tim Bray.
23     Q.  What did they say?
24     A.  They were just explaining the bargaining
25  package that they had received and what the severance

Page 8

1  would be if you got severance.  And then there was a
2  formula, I think, in the pamphlet that they gave us,
3  how many years you worked there, you get so many
4  weeks' pay.  There's, I guess, a long formula on
5  that.
6      Q.  Did you speak during the meeting?
7      A.  Yes, I did.
8      Q.  What did you say?
9      A.  I asked Ken Stanifer why we were not
10  allowed a chance to vote on that.
11     Q.  Did he respond?
12     A.  He said, what's to vote on, brother, it's
13  a done deal, there's nothing else there.
14     Q.  Did you say anything more during the
15  meeting?
16     A.  No.
17     Q.  Is this a morning meeting or afternoon
18  meeting?
19     A.  I believe it was morning.  I'm almost
20  positive it was morning.
21     Q.  Did other people talk during the meeting?
22     A.  Yeah, there was quite a bit of discussion
23  up in the front.  I was sitting in the very back,
24  right corner and couldn't really hear what they were
25  talking -- they were talking back and forth with Ken

Page 9

1  and people were in the front and I didn't -- I really
2  couldn't hear them.  So I raised my hand and was
3  recognized and that's when I asked him that -- what's
4  to vote on?  So --
5      Q.  Do you remember anything that anyone else
6  said in the meeting?
7      A.  I just know everybody was upset -- that
8  everybody felt that we should vote on it.
9      Q.  Can you say if you had voted, how you
10  would have voted on it?
11     A.  I would have voted against it.
12     Q.  And do you have an idea of what would have
13  happened if people had voted against it?
14     A.  Well, I think the union should have went
15  back and tried to renegotiate and possibly get the
16  severance for everyone, that's probably what it would
17  have taken, probably, to get it ratified.  And they
18  already went back and supposedly got the people who
19  did drugs -- if they failed the drug test, they got
20  the severance, why couldn't they have negotiated for
21  everybody, not just the drug addicts?
22     Q.  You think they could have gotten severance
23  for everyone?
24     A.  We'll never know.
25     Q.  Do we know if they would have lost

3 (Pages 6 to 9)

Page 10

1  severance for anyone?
2      A.  We'll never know.  That's always a company
3  bluff but sometimes they're serious and sometimes
4  they're not.  I think everybody in that meeting was
5  willing to take that chance, everybody that you could
6  hear and everybody that I talked to after the
7  meeting.  Everybody wanted them to vote on it.
8      Q.  What time period did you have before
9  International Pape actually left?
10      A.  We don't know.  We know that it had been
11  up for sale ever since International had bought it.
12  We don't know when they planned on getting rid of it,
13  we're not 100 percent sure if they would have gotten
14  rid of it.  They had Beckett up for sale at the same
15  time; beckett's still International.  So evidently
16  they changed their mind.  They may have changed their
17  mind with us, we don't know that.
18      Q.  After that, did you file a grievance?
19      A.  No.
20          (Off the record.)
21      Q.  Or before that?
22      A.  No.
23      Q.  Have you ever filed a grievance ever?
24      A.  Yes.
25      Q.  What have you filed grievances on?

Page 12

1  as they didn't, then they should be ultimately
2  responsible for it.
3      Q.  And what they should have bargained for
4  was severance pay for people who did not wish to
5  continue working at the mill?
6      A.  They should have bargained for severance
7  pay for everybody who worked there.  We were all
8  terminated on the same day, we should have all gotten
9  the severance package.
10      Q.  And again, you have no idea whether they
11  could have actually achieved that or not?
12      A.  No, I do not.
13      Q.  Have you held union office over the years?
14      A.  Yes, I was a union steward and a chief
15  steward.
16      Q.  When was that?
17      A.  Early to mid '90s, probably.
18      Q.  Are those elected positions?
19      A.  Chief steward was elected.
20      Q.  Have you run for other offices?
21      A.  No.
22      Q.  The chief steward is a local officer?
23      A.  Yeah.  I think there's different sections
24  and it's — each section of the mill has their own
25  chief steward, I think there's 10 or 12.

Page 11

1      A.  Mostly working conditions over the years
2  and various things — but mostly it was working
3  conditions.
4      Q.  When did you decide not to apply to Smart
5  Papers?
6      A.  Probably during January when the — when
7  we were informed that there was a tentative sale with
8  Smart.
9      Q.  So you decided before the union meeting
10  you would not be interested in working for Smart?
11      A.  Right.
12      Q.  Do you know how much your severance pay
13  would have been?
14      A.  Somewhere between 35 and 40,000.
15      Q.  And that's what your suing for at this
16  point?
17      A.  That plus attorney fees.
18      Q.  And who do you think ought to pay the
19  severance pay?
20      A.  International Papers should pay it.
21      Q.  Okay.
22      A.  But if they won't pay it, then it should
23  fall on the union because we were very ill advised on
24  that.  We felt that the union should have bargained
25  in good faith for us and let us vote on that and be

Page 13

1      Q.  Have you been involved in any lawsuits
2  other than this one?
3      A.  Just the asbestos lawsuit.
4      Q.  That's against Champion and IP?
5      A.  No, that's against the asbestos
6  manufacturers.
7      Q.  When you had grievances over working
8  conditions, did the union represent you on those
9  grievances?
10      A.  Yes.
11      Q.  Did you win them?
12      A.  One some, lost some.
13      Q.  Did you go to arbitration on any of them?
14      A.  I don't believe so.
15      Q.  On the ones you lost, did the union decide
16  not to pursue them further?
17      A.  I believe that was it.
18      Q.  And what process did the union go through
19  in deciding not to pursue any further?
20      A.  I believe the executive board voted on
21  them but I'm not 100 percent sure.  We just get the
22  answer down through Tim Bray, whether they were going
23  to continue them or not.
24      Q.  At any rate, there wasn't a membership
25  vote on them?

4 (Pages 10 to 13)

Ace Reporting Services  (513) 241-3200
30 Garfield Place, Suite 620   Cincinnati, Ohio  45202

**APPENDIX G**

Page 1

```
 1                UNITED STATES DISTRICT COURT
 2                SOUTHERN DISTRICT OF OHIO
 3                    WESTERN DIVISION
 4
      -----------------------------------
 5                                        :
      DORMAN ANGEL, et al.,               :
 6                                        :
              Plaintiffs,                 :
 7                                        :
          vs.                             :      CASE NO.
 8                                        :      C-1-01-467
      UNITED PAPERWORKERS                 :
 9        INTERNATIONAL UNION (PACE)      :
          LOCAL 1967, et al.             :
10                                        :
              Defendants.                 :
11                                        :
      -----------------------------------
12
13
14       Deposition of:  PETER L. CECERE, JR.
15       Taken:          By the Defendants
                         Pursuant to Notice
16
         Date:           December 17th, 2004
17
         Time:           Commencing at 2:44 p.m.
18
         Place:          Kircher, Robinson
19                         & Welch Co., L.P.A.
                         2520 Kroger Building
20                       1014 Vine Street
                         Cincinnati, Ohio  45202
21
         Before:         Jennifer Coats
22                       Notary Public - State of Ohio
23
24
25
```

COPY

**Ace Reporting Services  (513) 241-3200**
**30 Garfield Place, Suite 620   Cincinnati, Ohio  45202**

Page 10

1    A. Yeah, that's what we were told the local
2 did, yeah.
3    Q. Did some people get severance pay?
4    A. Yeah, some did. I thought all should
5 have. We were all terminated by IP.
6    Q. And you thought you should have got the
7 same severance pay as people who did not have any job
8 anymore?
9    A. Yeah. I didn't know that I had a job
10 either.
11    Q. But --
12    A. Not until they called us to the
13 Hamiltonian and they -- part of them they said, okay,
14 you're no longer employed, you're gone. And the
15 other ones they said, you're the best of the best,
16 you're the cream of the crop, we're hiring you.
17    Q. Okay. But as part of the cream of the
18 crop --
19    A. Yeah, that's what they put, not me.
20    Q. -- you got hired. Do you think you should
21 have gotten the same severance pay as the people who
22 were out in the street?
23    A. Yeah, I was starting all over again. I
24 had to hunt a job, I put in my application. I guess
25 that's why I got the job, because I'm a good worker,

Page 11

1 that's the way I feel about it.
2    Q. Okay. What do you think the union should
3 have got for you at that point?
4    A. Well, I think we should have been more
5 informed about what was going on. I know for one
6 instance there they said they had a 800 number that
7 if you didn't -- what I should have had the right to
8 make the decision, that it was like we had a gun held
9 to our head. You will apply for a job, if you --
10 they offer you a job, you will accept it. If you
11 don't accept it, you're not entitled to unemployment
12 and your severance package. But if you could get
13 terminated, you get your severance package. It's
14 like they were -- you know, it just -- we were not --
15 most of the stuff we wasn't -- they told us as we was
16 going along but it was like -- 800 number that you
17 could call before this happened and you wanted a
18 severance package and didn't want to work there.
19 Well, the best of my knowledge nobody, hardly knew at
20 all -- knew about it. And the union had it but they
21 never released it out to the membership.
22    Q. Who in the union had it?
23    A. Well, I was told Tim Bray had it.
24    Q. Who told you that?
25    A. Well, that's going -- I can't really

Page 12

1 remember right now. But I remember I was told that.
2    Q. But you don't remember who told you that?
3    A. I'm trying -- not at this time, I can't.
4    Q. Did whoever told you that tell you when
5 Tim Bray had the number?
6    A. They said something about Hocutt Phillips
7 had it -- I'm trying to remember all of the stuff on
8 that. And they knew it and was prior -- prior to the
9 rehiring but I'm not sure when it was. I know Hocutt
10 Phillips was involved with that.
11    Q. So the union should have kept you better
12 informed?
13    A. Right.
14    Q. And if they had, would you have gotten
15 better results?
16    A. I couldn't speculate on that, I don't
17 know, I would hope so.
18    Q. How would you have gotten better results?
19    A. Well, for one thing, I -- we had a binding
20 contract, as far as I was concerned, until September
21 of that year and that was all done away with. And
22 then I know Tim Bray; I talked to him several times
23 and he talked about it was under the same desk or
24 something.
25    Q. "Same desk"?

Page 13

1    A. Something like that. Yeah, same desk rule
2 or something. But, you know, I'm supposed to be
3 working for a completely different company. I worked
4 for Champion. Champion -- IP bought them out and
5 supposedly I was terminated by IP and then hired by
6 Smart Paper. We kept asking the union about what was
7 going on and everything, it seemed like was always
8 left in the dark.
9    Q. Did the union have any power to keep IP
10 operating the mill?
11    A. No. No, they didn't.
12    Q. As far as you know, IP didn't have to stay
13 in the business past January or February of '01,
14 right?
15    A. Right. They could have shut it down, that
16 rumor traveled around the mill, also.
17    Q. Okay.
18    A. That they were -- they could just shut it
19 down but they kept saying they were going the try to
20 sell us.
21    Q. If they had just shut it down, what would
22 have happened to you?
23    A. I would have been out looking for a job.
24    Q. Okay. And during the period since that
25 time, you've been looking for the job, right?

4 (Pages 10 to 13)

**APPENDIX H**

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF OHIO
 3                   WESTERN DIVISION
 4
       ------------------------------------
 5                                         :
     DORMAN ANGEL, et al.,                 :
 6                                         :
             Plaintiffs,                   :
 7                                         :
        vs.                                :      CASE NO.
 8                                         :      C-1-01-467
     UNITED PAPERWORKERS                   :
 9      INTERNATIONAL UNION (PACE)         :
        LOCAL 1967, et al.                 :
10                                         :
             Defendants.                   :
11                                         :
       ------------------------------------
12
13
14       Deposition of:  ROBERT CHESTNUT
15       Taken:          By the Defendants
                         Pursuant to Notice
16
         Date:           December 20th, 2004
17
         Time:           Commencing at 11:55 a.m.
18
         Place:          Jacobs, Kleinman, Seibel
19                          & McNally Co., L.P.A.
                         2300 Kroger Building
20                       1014 Vine Street
                         Cincinnati, Ohio  45202
21
         Before:         Jennifer Coats
22                       Notary Public - State of Ohio
23
24
25                                         COPY
```

**Page 6**

1  them without me being there. And if I couldn't do
2  the job the way it was supposed to be done, I didn't
3  want to do it at all.
4      Q.  Does the president or the executive board
5  have a right to settle these grievances?
6      A.  In third step, I guess they do. But they
7  would let the time limits expire and everything else
8  by not appealing them all to the membership, as far
9  as the vote for arbitration or whatever the case may
10  have been.
11      Q.  Have you ever filed any charges against
12  the union officials?
13      A.  No. What do you mean by file charges?
14      Q.  Well, have you filed any charges under the
15  bylaws of the international constitution?
16      A.  No, I didn't.
17      Q.  Do you know that you have a right to file
18  charges against the union officers under the
19  constitution?
20      A.  Yes, I did. At that time I felt that it
21  was easier to resign and just get out of it.
22      Q.  Have you filed charges against union
23  officers or the union anywhere else, like the EEOC or
24  other government agencies?
25      A.  No.

**Page 7**

1      Q.  Have you filed any other lawsuits other
2  than this one?
3      A.  No, I haven't.
4      Q.  Have you been party to any other lawsuit?
5      A.  No.
6      Q.  Do you have any criminal record?
7      A.  No.
8      Q.  In early 2001, did you apply for a job
9  with Smart Paper?
10      A.  Yes, I did.
11      Q.  Did you get an offer from Smart Paper?
12      A.  Yes, I did.
13      Q.  Did you accept it?
14      A.  Yes, I did.
15      Q.  Around that time, did you apply for
16  employment with any other employers?
17      A.  I filled applications out, yeah.
18      Q.  Did you get any other offers?
19      A.  No.
20      Q.  Since that time, have you applied to other
21  employers?
22      A.  Yes, I have.
23      Q.  And have you received any offers?
24      A.  No, I haven't.
25      Q.  Did you go to union meetings in January of

**Page 8**

1  '01?
2      A.  Yes, I did.
3      Q.  Did you speak at these meetings?
4      A.  No, I did not.
5      Q.  Did you file any grievances in January of
6  '01?
7      A.  Not that I recall, no.
8      Q.  Or in February of '01?
9      A.  Not that I can recall, no.
10      Q.  Do you think that International Paper owes
11  you some damages in this lawsuit?
12      A.  I don't know, really.
13      Q.  Do you think that Smart Paper owes you
14  damages in this lawsuit?
15      A.  I wouldn't think so, no.
16      Q.  Do you think that the international union
17  owes you some damages in this lawsuit?
18      A.  Yes, I do.
19      Q.  What do they owe you?
20      A.  I feel that they owe me my severance pay
21  and everything that they negotiated away.
22      Q.  Why do they owe you your severance pay?
23      A.  Because they took away my right to vote on
24  the Effects Bargaining Package.
25      Q.  Did they take away your right to severance

**Page 9**

1  pay?
2      A.  By saying that it was a done deal and me
3  getting a job offer? Yes, they did.
4      Q.  Okay. If you had voted on the Effects
5  Bargaining Package, do you think you would have
6  gotten severance pay?
7      A.  I would have had the opportunity to vote
8  it down.
9      Q.  Okay. Suppose a majority of people voted
10  with you and you would have voted it down.
11      A.  Yes.
12      Q.  Would you have gotten severance pay?
13      A.  I feel that the unions would have had to
14  go back to the company for more Effects Bargaining.
15      Q.  How long did they have to do Effects
16  Bargaining?
17      A.  The one paper that they passed out about
18  the Effects Bargaining stated, pending ratification
19  by January 30th of 2001.
20      Q.  You think they could have gotten severance
21  pay for you by January 30th of 2001?
22      A.  My personal opinion?
23      Q.  Yes.
24      A.  Yeah.
25      Q.  How much severance pay?

3 (Pages 6 to 9)

**APPENDIX I**

Page 1

1           UNITED STATES DISTRICT COURT
2           SOUTHERN DISTRICT OF OHIO
3                WESTERN DIVISION
4                                          **DISK**
   ------------------------------------    **ENCLOSED**
5                                    :

DORMAN ANGEL, et al.,               :
6                                    :
         Plaintiffs,                :
7                                    :       CASE NO.
      vs.                           :      C-1-01-467
8                                    :
UNITED PAPERWORERS                  :
9    INTERNATIONAL UNION (PACE)      :
     LOCAL 1967, et al.             :
10                                   :
         Defendants.                :
11                                   :
   ------------------------------------

12
13
14      Deposition of:  CONEY CHITWOOD
15      Taken:          By the Defendants
                        Pursuant to Notice
16
        Date:           December 16th, 2004
17
        Time:           Commencing at 4:19 p.m.
18
        Place:          Jacobs, Kleinman, Seibel
19                        & McNally Co., L.P.A.
                        2300 Kroger Building
20                      1014 Street
                        Cincinnati, Ohio  45202
21
        Before:         Jennifer Coats
22                      Notary Public - State of Ohio
23
24                                   COPY
25

**Ace Reporting Services  (513) 241-3200**
**30 Garfield Place, Suite 620   Cincinnati, Ohio  45202**

**Page 10**

1 that's let go by any company is entitled to severance
2 pay?
3    A. I have read that that's not necessarily
4 true, that that could happen but they did get -- give
5 everybody else that.
6    Q. By "everybody else" --
7    A. Except for the ones that stayed with
8 Smart. And the ones that stayed with Smart were told
9 that if something happened at the end of that year,
10 we would get our severance.
11    Q. Okay. And you believe that you should
12 have gotten the severance anyway?
13    A. Yes.
14    Q. And just trying to be clear on this, this
15 is because you've read that sometimes people get
16 severance pay when they're severed from companies?
17    A. Well, at times. Most of the time they do
18 but it's not that way in the world anymore, as far as
19 business.
20    Q. Okay. Do you think that the union could
21 have done any better in bargaining in January of
22 2001?
23    A. I think they could have.
24    Q. And what more could they have done?
25    A. Better wages, better benefits. I can't

**Page 11**

1 see why they couldn't have stayed the way it was.
2    Q. Did they have a deal with Smart in the
3 year 2001, that you know of?
4    A. No, that I know of. Not for sure, really.
5    Q. Do you know that there was a contract
6 reached with Smart in 2002?
7    A. What was that?
8    Q. Was there, in fact, a contract -- a
9 collective bargaining agreement reached with Smart in
10 the year 2002?
11    A. That was when our last contract was,
12 right?
13    Q. Right.
14    A. 2002.
15    Q. Yes.
16    A. It was reached. But as far as I know --
17 and from hearsay -- going on for right now -- that it
18 hasn't even been signed.
19    Q. Is it in effect?
20    A. If it hadn't been signed, how's it going
21 to be in effect? It's in effect, probably, but
22 they're all the time bargaining back and forth so I
23 don't -- it's just hearsay that, you know, it hasn't
24 been signed.
25    Q. Did you go on strike in 2000?

**Page 12**

1    A. Yes.
2    Q. What was your wage rate at the time you
3 went on strike?
4    A. My wage rate was 19 something.
5    Q. Okay. And --
6    A. That's because I took a crew leader job.
7 It's more or less like a working foreman.
8    Q. And did you go back to work after the
9 strike?
10    A. Yes, I did.
11    Q. And did you get a pay increase at that
12 point?
13    A. No.
14    Q. No pay increase?
15    A. I don't remember one.
16    Q. Have you had any pay increases since?
17    A. Yes.
18    Q. Was that under a contract?
19    A. I think it was.
20    Q. Is it your understanding?
21    A. I think there was a contract. After the
22 contract, there was a pay increase, I think.
23    Q. Okay. And --
24    A. It might have been 1 1/2 or something like
25 that -- one percent.

**Page 13**

1    Q. And the contract was reached at the end of
2 the strike, correct?
3    A. No, the contract was reached but not
4 the -- was it signed? I don't know. Nobody ever
5 says, you know, whether it was signed or not.
6    Q. Is it your understanding that the union
7 reached a settlement --
8    A. It reached a settlement.
9    Q. -- at the end of the strike?
10    A. Yeah.
11    Q. And that settlement provided for pay
12 increases?
13    A. Yes.
14    Q. And you've gotten the pay increases that
15 it provided for?
16    A. Yes.
17    Q. Now before the strike, was there a
18 collective bargaining agreement between Smart and the
19 union?
20    A. I think it just, more or less -- no -- I
21 don't know.
22    Q. Okay.
23    A. I can't remember.
24    Q. How much were you making before Smart took
25 over?

4 (Pages 10 to 13)

**Ace Reporting Services  (513) 241-3200**
**30 Garfield Place, Suite 620   Cincinnati, Ohio  45202**

**APPENDIX J**

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF OHIO
 3                   WESTERN DIVISION
 4
      ------------------------------------
 5                                       :
     DORMAN ANGEL, et al.,               :
 6                                       :
             Plaintiffs,                 :
 7                                       :
        vs.                              :     CASE NO.
 8                                       :     C-1-01-467
     UNITED PAPERWORKERS                 :
 9     INTERNATIONAL UNION (PACE)        :
       LOCAL 1967, et al.                :
10                                       :
             Defendants.                 :
11                                       :
      ------------------------------------
12
13
14        Deposition of:  OLIVIA DAY
15        Taken:          By the Defendants
                          Pursuant to Notice
16
          Date:           January 13th, 2005
17
          Time:           Commencing at 4:32 p.m.
18
          Place:          Jacobs, Kleinman, Seibel
19                          & McNally Co., L.P.A.
                          2300 Kroger Building
20                        1014 Vine Street
                          Cincinnati, Ohio  45202
21
          Before:         Jennifer Coats
22                        Notary Public - State of Ohio
23
24
25                                        COPY
```

Page 10

1  workers' comp. I'm trying to think -- where they
2  kind of reintroduce you to the work force so you can
3  start working -- eventually you can work up to
4  what you -- you know, working before; it was kind of
5  a retraining program and something I had to do. In
6  which I didn't have any problem doing it because I
7  didn't just want to receive workers' compensation and
8  sit at home when I could work. But I couldn't go to
9  my doctor -- me and my doctor established that I
10 could not go back to Smart Paper Company but I didn't
11 want to sit at home and just get checks. I got
12 reintroduced into the work force and got some
13 retraining and I'll be back into the work force.
14     Q.  What do you do for the school district?
15     A.  I am a computer lab librarian for an
16 elementary school.
17     Q.  And how much do you make in that job?
18     A.  9.73. And through workers' comp I receive
19 the -- that's what I mean by wage loss, I receive the
20 difference between that and what I made at Smart.
21     Q.  Okay. And does that wage loss go on
22 indefinitely as far as you know?
23     A.  No. No, actually it ends, I believe, in
24 September of this year.
25     Q.  You receive it for four years?

Page 11

1     A.  Up to four years.
2     Q.  Were you a member of the union during the
3  period you worked at the mill?
4     A.  Yes.
5     Q.  Were you ever an officer of the union?
6     A.  No.
7     Q.  Did you run for office in the union?
8     A.  No.
9     Q.  Did you go to any union meetings in
10 January of 2001?
11     A.  No, I was ill. I was working but I was
12 ill and I didn't go.
13     Q.  In this case, you're suing Smart Paper,
14 International Paper, the international union and the
15 local union and I'd like to ask you about each of
16 those. What do you think Smart Paper owes you for?
17     A.  For actually -- for severance pay from
18 International -- going from International to Smart.
19 I actually believe it's not Smart Paper that owes me,
20 I believe it's International that owes me.
21     Q.  Does Smart Paper owe you for anything?
22     A.  Well, through workers' comp, yes, but
23 that's separate. So they do owe me something -- yes,
24 Smart Paper owes me something.
25     Q.  But not in this case?

Page 12

1     A.  No.
2     Q.  And International Paper owes you for
3  severance pay?
4     A.  Yes.
5     Q.  How much severance pay?
6     A.  About 23,000.
7     Q.  Does PACE International owe you for
8  something in this case?
9     A.  Yeah, they may. Yeah, not being
10 represented but I couldn't put a dollar amount on it.
11     Q.  Okay. How about the local?
12     A.  Yeah, they're along with it also. Yeah,
13 but I couldn't put a dollar amount on it -- or lack
14 of representation.
15     Q.  What should the international have done
16 that it didn't do?
17     A.  They should have given us -- and like I
18 said, I wasn't at the meeting but they should have
19 given us a clear understanding of what the company
20 was asking us to do, as far as putting in
21 applications, reapplying for jobs that we already
22 were working on -- working on some 20-odd years; some
23 people longer than that, I think. They should have
24 not told us that we shouldn't go have to reapply for
25 jobs and take drug tests for jobs that we worked

Page 13

1  for -- for 20-some odd years. And I just don't feel
2  like they represented us.
3     Q.  If the international had told you not to
4  reapply for a job --
5     A.  Uh-huh.
6     Q.  -- where would that have left you?
7     A.  Negotiating. I think we could have
8  negotiated, especially for wages, as a union. I
9  think they would have negotiated with us.
10     Q.  Who would have negotiated with you?
11     A.  Smart.
12     Q.  Before they hired you?
13     A.  Uh-huh.
14     Q.  And you think you'd have gotten better
15 wages from them?
16     A.  Have a better chance, yes.
17     Q.  Can you put a dollar figure on that?
18     A.  As far as the wage I received and the wage
19 I left the job, I think I would have gotten the same
20 wage -- I should have. I think we could have had a
21 chance to get -- receiving our same wages and just
22 coming back to work.
23     Q.  And do you think the union could have
24 gotten that in negotiations?
25     A.  Uh-huh. I definitely believe yes.

4 (Pages 10 to 13)

**APPENDIX K**

Page 1

```
 1                UNITED STATES DISTRICT COURT
 2                 SOUTHERN DISTRICT OF OHIO
 3                     WESTERN DIVISION
 4
      ------------------------------------
 5                                        :
     DORMAN ANGEL, et al.,                :
 6                                        :
              Plaintiffs,                 :
 7                                        :
          vs.                             :      CASE NO.
 8                                        :      C-1-01-467
     UNITED PAPERWORKERS                  :
 9     INTERNATIONAL UNION (PACE)         :
       LOCAL 1967, et al.                 :
10                                        :
              Defendants.                 :
11                                        :
      ------------------------------------
12
13
14       Deposition of:   ELLSWORTH WILLIAMSON
15       Taken:           By the Defendants
                          Pursuant to Notice
16
         Date:            December 17th, 2004
17
         Time:            Commencing at 1:09 p.m.
18
         Place:           Kircher, Robinson
19                          & Welch Co., L.P.A.
                          2520 Kroger Building
20                        1014 Vine Street
                          Cincinnati, Ohio  45202
21
         Before:          Jennifer Coats
22                        Notary Public - State of Ohio
23
24
25
```

COPY

Ace Reporting Services  (513) 241-3200
30 Garfield Place, Suite 620   Cincinnati, Ohio  45202

Page 26

1    A.  Well, as far as just voice opinion out,
2    yeah. But as far as asking a direct question to one,
3    they already answered it and it wasn't really
4    discussing it after they got through saying what they
5    did.
6        Q.  What did you do to voice an opinion out?
7        A.  Asked them why we couldn't vote on
8    anything.
9        Q.  Was there an answer to that?
10       A.  Well, there's an answer to everybody when
11   I blurted it out -- several people blurted it out.
12   The answer was -- that he told everybody the same
13   thing, you know. Ken Stanifer said it was a done
14   deal. His boss told him to sign it and that was it.
15       Q.  Did Ken Stanifer lie to you in that
16   meeting?
17       A.  No.
18       Q.  Did Tim Bray lie to you in that meeting?
19       A.  I don't know. I figure Stanifer didn't
20   lie when he said they signed the papers.
21       Q.  Did Stanifer lie about anything in that
22   meeting?
23       A.  I don't know. I'd say --
24       Q.  Did Tim Bray lie about anything in that
25   meeting?

Page 27

1        A.  When they said we wasn't allowed to vote
2    on anything, yeah, they lied to us on that.
3        Q.  You thought you were lied to about it?
4        A.  Well, yeah, we're supposed to vote on
5    everything.
6        Q.  You vote on grievance settlements?
7        A.  No. On a grievant settlement?
8        Q.  Yes.
9        A.  No, we don't vote on that, if you got a
10   grievance. You're talking about if a union steward
11   files a grievance for somebody.
12       Q.  Yes.
13       A.  No, not there.
14       Q.  Do you vote on anything except future
15   terms and conditions?
16       A.  If you go -- if somebody wants to
17   arbitrate a case, you have to take it before the
18   board, yeah, they vote on that, whether to or not, if
19   that's what you're talking about. That's as far as
20   it goes, as far as that but we're supposed to vote on
21   anything that's going to effect our lives; we wasn't
22   allowed to.
23       Q.  Okay. That's going to effect your lives
24   in the future, right?
25       A.  Past, present, future.

Page 28

1        Q.  Okay. Have you -- can you recall at this
2    point any vote you had on any agreement with the
3    company that didn't have to do with future
4    conditions?
5        A.  I can't understand you, you've got your
6    hand over your mouth.
7        Q.  I'm sorry.
8        MR. ROBINSON.  Could you read that back
9    for him, please?
10       (The record was read.)
11       A.  No, we wasn't allowed to vote on nothing,
12   I told you that already. Everything was signed,
13   sealed and delivered, we didn't get a chance to vote
14   on nothing.
15       Q.  If you had voted, what would have
16   happened?
17       A.  I don't know, we didn't get an
18   opportunity. I have no idea, I can't answer that. I
19   don't know, we didn't have an opportunity to see
20   anything -- nobody seen nothing.
21       Q.  Okay. You don't have any idea what your
22   damages might have been from the lack of a vote?
23       A.  Do I understand what they done -- damage
24   was done to me because we wasn't allowed to vote, is
25   that what you're asking me?

Page 29

1        MR. ROBINSON:  Will you read the question
2    back, please?
3        (The record was read.)
4        A.  We wasn't -- nothing was ever told to us.
5    We don't know, it wasn't explained, it was said, a
6    done deal, that's it.
7        Q.  Do you have an idea of how you would come
8    out better if you would have had a vote?
9        A.  No.
10       Q.  So to recap it a little bit, how much
11   money do you want from International Paper in this
12   case?
13       A.  Whatever I can get.
14       Q.  How much money do you want from the
15   international union in this case?
16       A.  Whatever I can get and as much as I get
17   and what they owe me.
18       Q.  How much do you want from the local union
19   in this case?
20       A.  They're all the same, local and
21   international.
22       Q.  And you want nothing from Smart Paper in
23   this case?
24       A.  Yeah. If I can get something, I'll take
25   it, yeah.

8 (Pages 26 to 29)